STATE OF MISSOURI, Respondent, v. OSCAR HENRY BOHANNON, Appellant, No. 41985—234 S. W. (2d) 793.

Division Two, December 11, 1950.

*Sigmund M. Bass* for appellant.

*J. E. Taylor,* Attorney General, and *Lawrence L. Bradley,* Assistant Attorney General, for respondent.

[794]  ELLISON, P. J.—The appellant was convicted by a jury in the circuit court of the City of St. Louis on an information drawn under the Habitual Criminal Act, Sec. 4854, R. S. 1939, Mo. R. S. A., charging prior convictions of seven felonies, and the alleged instant crime of feloniously stealing a motor vehicle of the value of more than $30, the property of one Simon Bluestein, in violation of Sec. 8404(a), R. S. 1939, Mo. R. S. A.  The maximum punishment under that statute is imprisonment in the State penitentiary for 25 years.  The jury found he had been convicted of four of the prior felonies and guilty of the larceny here charged, and as-

sessed his punishment at imprisonment in the penitentiary for 8 years.

Appellant assigns error here under 15 points. Nine of these assail in one way or another the habitual criminal part of the information, and the reading thereof including the jurat, to the jury. One complains that appellant was not granted the proper number of challenges to the members of the jury panel. Two charge error in two instructions. Two complain of insufficient proof. And the last one asserts there were numerous prejudicial errors in the argument of counsel for the State to the jury.

The facts, in brief, were that the motor vehicle allegedly stolen was a 1946 Mercury [795] four door sedan, which the owner Bluestein had locked and parked in front of his apartment on Easton Avenue about 6:45 p. m. on December 16, 1946. About 9 p. m. he looked out of his window and saw the automobile was gone. He called the police. They came out and he showed them his title certificate and later gave it to them. He first testified the motor number of the automobile was 99-A-1107430. Later he said he didn't look at the number on the automobile engine block itself, and that the number he had just given was on his title certificate. He next saw his automobile at police headquarters the following night, December 17, after the police had called him.

Early on that day of December 17 appellant had talked to Carl McReynolds, a filling station operator in St. Louis about a 1946 Mercury sedan, first on the telephone around noon. The second time was about 9 p. m. that night. McReynolds had known appellant for 2 or 3 months by the name of Sam. His partner in the filling station business was his brother-in-law Lincoln Hayes. The latter testified he was with McReynolds that night when they met appellant. It was at a parking lot near the filling station. Hayes said they went there to ''meet a party and buy an automobile.''

Presently, appellant drove into the lot with the Mercury sedan and stopped. McReynolds and Hayes got in the front seat with him. Soon thereafter a police car turned in across the front of the parked Mercury car and stopped. In it were Detective Sergeant Richard Jerabek, in charge of the Auto Theft Bureau of the St. Louis Police Department and Detective Sergeant Walter Cliffe of the same Bureau. Sergeant Jerabek testified the occasion of their trip to the parking lot was that they had received information from Lincoln Hayes, the partner of Carl McReynolds, that those two would be in that parking lot at that time with an automobile they intended to buy. Sergeant Cliffe had been posted on foot at a nearby corner and saw the appellant drive in.

Sergeant Jerabek testified specifically, and Sergeant Cliffe and McReynolds more generally, as to what occurred next. Jerabek said they informed appellant he was under arrest and he asked on

what ground. Jerabek told him on suspicion of having stolen the Mercury sedan he was driving. Appellant answered that it ''is a good car'' and produced an Illinois license certificate therefor, showing the motor number was 99-A-983264, purportedly issued to Harry Turner of 1718 Coyne Street, East St. Louis, Illinois, November 21, 1946. The first, or 99-A part of this motor number was the same as on Bluestein's Missouri certificate for his Mercury sedan, but the last six figure number was different, that on Bluestein's certificate being the seven figure number 1107430. Detective Sergeant Neibert testified he had investigated the above East St. Louis address as of the above date and found no such street number in the city directory, and no telephone book showing a person thereat named Harry Turner.

Appellant said he had bought the Mercury sedan about noon that day from a man named Lester —— in front of an auto auction place on North Broadway. He didn't know the man's surname and couldn't describe him, and refused to answer further questions until he had seen his lawyer. The police turned the automobile over to Bluestein because it was the same color as his and on his identification of particular parts or accessories thereon, as described by him in his testimony and again to the officers. Also the automobile keys turned over to the police by Bluestein fit the automobile taken from appellant.

Later officer Harris who had been assigned to the laboratory of the Police Department for four years, testified he took two photographs of the motor block or frame under the engine hood of the Mercury sedan claimed by Bluestein. One photograph was of the number 99-A-983264, the same as appears in appellant's Illinois title certificate. The other photograph was of the same number after chemicals had been applied to the metal. The witness said he saw under the figures 98, or 983, traces of the figures 110, these being the same as the first three figures in the number on Bluestein's automobile title certificate.

One other evidentiary fact was proven by the State. J. R. Shibley, registrar of automobile title certificates in Randolph County, [796] Arkansas, testified a book of such blank certificates, No's 23,401 to 23,450 [and therefore presumptively containing certificate No. 23,408], was taken from his office between October 3 and November 22, 1946. A certificate bearing that serial number marked ''Exhibit G'' was shown to him, purportedly issued to Harry Turner in Pulaski County, Arkansas, covering an automobile with motor number 99-A-983264. This was the same license and motor number as appeared in appellant's Illinois certificate heretofore mentioned. Mr. Shibley said his office did not issue the Arkansas certificate.

Next, Ray H. McCarthy, a supervisor in the filing division of the office of the Illinois Secretary of State in December, 1946, was

shown the Arkansas certificate "Exhibit G." He testified that it was a part of the original files in his office; that he had brought it to appellant's trial; and that his office accepted it as authentic and retained it when they issued the Illinois certificate for one automobile with the same motor number shown in the Arkansas certificate to the same designated person Harry Turner. The appellant offered no evidence, but stood on a demurrer to the State's evidence.

■ Appellant's first point is that the trial court erred in overruling his motion to quash the State's second amended information. His counsel cite the habitual criminal statute, Sec. 4854, supra; the 5th and 14th Amendments, Const. U. S.; Sec's 2 and 10 of Art. I, Art. II and Art.V, Const. Mo. 1945; and Manz v. Ry. Co., 87 Mo. 278. Counsel states merely that he is offering the foregoing citations without argument, notwithstanding the holding in State v. Brinkley, 354 Mo. 337, 374(27), 189 SW. (2d) 314, 334-5 (49, 50).

The first four citations to the Federal and State Constitutions can only be made as bearing on the right to liberty and due process. Articles II and V of the State Constitution have no bearing at all. The first deals with the distribution of the powers of government, and the second covers the Judicial Department. The Manz case holds that even in civil litigation a penal statute is construed more strictly than would be required in ordinary cases. And the cited part of the Brinkley case holds the habitual criminal section 4854 imposes the aggravated penitentiary punishments designated therein when the defendant's prior conviction was of a crime merely *punishable* by a penitentiary sentence though it may also range down to a jail sentence or fine. Appellant evidently thinks the punishment for the prior crime must be a penitentiary punishment, and no less. We do not agree. The holding to the contrary in the Brinkley case was followed in State v. Updegraff (Mo., Div. 2) 214 SW. (2d) 22, 24 (1, 2), and State v. Hacker, 214 SW. (2d) 414, 415(3).

■ Appellant's 2nd, 3rd, 7th, 8th, 9th and 10th points complain that the second amended information, in invoking the Habitual Criminal Act, charged he had previously been convicted of *seven* other felonies, whereas it should have been limited to *one*, either by allegation or the State's election; and that the information was read to the jury and sustaining evidence introduced by the State—all over appellant's objections in various forms. The authorities cited are the Manz case, supra, and Moore v. Shelly Motors, Inc. (Mo. App.) 225 SW. (2d) 953, 956-7. Neither has the slightest bearing on the Habitual Criminal Act. The Manz case was a civil suit against a railroad under the double damage act, and as stated above the decision held the statute was penal in nature and therefore to be more strictly construed as to allegations and proof. And the

386

Moore case was a civil suit for conversion of personal property seeking both actual and punitive damages. It was merely held there that the accumulation of improper and prejudicial comments, questions, insinuations and accusations by plaintiff's counsel constituted reversible error. No question or principle was involved that would be applicable here.

Both these decisions are far afield from the instant legal question, which is whether the State, in a criminal prosecution under the Habitual Criminal Act, may plead, prove and submit more than one prior conviction of the defendant on a felony charge. It has been done many times, and in some of the cases the convicting jury [797] did not find against the defendant on all the prior convictions alleged. State v. Ortell (Mo. Div. 2) 50 SW. (2d) 1037; State v. Tyler (Mo. Div. 2) 349 Mo. 167, 171(5), 159 SW. (2d) 777, 780(7); State v. Hall (Mo. Div. 2) 152 SW. (2d) 76; State v. Marlin (Mo. Div. 2) 177 SW. (2d) 485, 488(10); State v. Miller (Mo. Div. 1) 202 SW. (2d) 887, 890(5), 891(8); State v. Hannon (Mo. Div. 1) 204 SW. (2d) 915, 917(5), 918(9, 11); State v. Humphrey (Mo. Div. 1), 357 Mo. 824, 828(3), 210 SW. (2d) 1002, 1005(8, 9).

■ Appellant's 4th point is that the trial court erred in overruling his objection to the jury—on the ground he was denied a sufficient number of challenges as prescribed by Sec. 4063, R. S. 1939, Mo. R. S. A. Under that statute, when a criminal case is tried in a city having a population of over 100,000 inhabitants [of which St. Louis is one], and the punishment is imprisonment in the penitentiary and may be for less than a specified number of years, or a jail sentence or fine [as is true under Sec. 8404(a)] the defendant is entitled to 8 challenges and the State to 4 challenges, making 12 in all. And under Sec. 4066 the jury panel must have 12 additional qualified jurors, making 24.

Appellant's brief states the record here will show that there were only 20 jurors on the panel from which was selected the jury that tried him. In support of that contention he cites page 12 of the record in the case. But on examination thereof it is found that appellant's counsel there stated to the trial court: "We except to the limitation of twenty-*four* men on the panel, and further at this time ask that the panel be discharged * * *." (Italics ours) And the same number *24* is repeated in appellant's review of the record in his printed brief. From all this it will be seen there is no merit in appellant's contention on this point.

■ Appellant's points 5 and 6 assign error on the facts that the assistant circuit attorney in making his opening statement to the jury under Sec. 4070, R. S. 1939, Mo. R. S. A. read to them the information in the cause and also the jurat, the latter being the prosecutor's affidavit attested by the circuit clerk. It declared the

facts stated in the information were "true, according to his best information and belief." That verification was necessary under Sec. 3894, R. S. 1939, Mo. R. S. A., and it was required to be in the form of an affidavit—not merely his oath of office. State v. Bonner, 178 Mo. 424, 431, 77 SW. 463; State v. Brown, 181 Mo. 192, 225-7(14), 79 SW. 1111, 1119(11).

First with reference to the reading of the information. Sec. 4070, supra, does not require it, the language of the statute being merely that the prosecuting attorney "must state the case"—meaning the charge and the facts upon which the State relies to prove it. But a number of decisions are cited in 9 West's Missouri Digest, p. 450, § 633(2), nearly all of which hold that while a reading of the information is not necessary or the better practice, yet it is not prejudicial error to do so if the jury are then or later instructed that the instrument constitutes a mere formal charge and that the defendant's guilt must be established by the evidence beyond a reasonable doubt. That was done here by instruction 4. So we rule this assignment against the appellant.

██ On the other point, as to the prosecutor's reading to the jury his affidavit attested by the circuit clerk, that the facts stated in the information were *true* according to *his* best information and belief. Appellant's counsel interposed specific, separate and timely objection to this, but it was promptly overruled by the court. As early as 1904 it was held in State v. Brown, supra, 181 Mo. l. c. 231-2(17, 18), 79 SW. 1111, 1121, that the prosecutor's affidavit verifying an information was not a part thereof, and that its purpose was merely to afford the *defendant* a guarantee of the good faith of the prosecution. This language was approved and quoted in a later case, State v. Lee, 303 Mo. 246, 259(5), 259 SW. 798, 805(10).

But while the prosecutor's affidavit that he believes the facts charged in the information are true, may afford some protection to the defendant as to the prosecutor's *good faith,* yet it can hardly be [798] considered a benefit to him (the defendant) to have the same affidavit read to the *jurors,* thereby giving *them* to understand that the *prosecutor* believes the facts charged in the verified information are true. The parties occupy different positions. The defendant is clothed with the presumption of innocence, however venal he may be. He can be convicted only on *evidence* presented to the jury showing his guilt beyond a reasonable doubt. And the affidavit is *not* evidence, or even a part of the information, as was held in the cases last cited. The State's theory in this case would turn against the defendant a precautionary statutory requirement intended for his protection.

Turning to the case law on this question. It was held in State v. Richards, 334 Mo. 485, 495(7), 67 SW. (2d) 58, 62(12, 13),

that the prosecuting attorney's affidavit verifying the information "ought not to be read to the jury." The opinion said further: "The only purpose of reading the verification could be to impress upon the jury that the prosecuting officer had sworn to the facts stated in the information and that would be improper." The case was reversed and remanded without specific assignment of the grounds therefor, but the above was one of several trial errors noted. This decision is cited on that point in 23 C. J. S., § 962, p. 284, note 49.

In State v. Gilmore, 336 Mo. 784, 788(3), 81 SW. (2d) 431, 432(3, 4), the defendant objected to the reading of the "information" to the jury without specifying whether the verification thereof was covered by the objection. The record on appeal showed the information was verified, but the opinion said it could not be determined with any degree of certainty whether the verifying affidavit had in fact been read to the jury. The decision held it is the better practice not to read even the information to the jury, but concluded there was no reversible error since the court had given precautionary instructions on the presumption of innocence and the requirement of proof of guilt by *evidence*, beyond a reasonable doubt. This case was affirmed.

In State v. Trice, 338 Mo. 744, 746(2), 92 SW. (2d) 135, 136(2), the defendant assigned error on the reading of the information and verifying affidavit to the jury, but the opinion stated the record showed that the information and *not* the verification was so read.

State v. Ransom, 340 Mo. 165, 172(2), 100 SW. (2d) 294, 296(3), followed the Richards case, supra, and held it was not error to read the information to the jury, but that the verifying affidavit should not be read.

State v. Null, 355 Mo. 1034, 1039(2), 199 SW. 639, 642(5, 6), followed the Richards, Gilmore and Ransom cases just discussed, and held it was better practice to refrain from reading the information, itself, to the jury but was not reversible error; and that the verification of the information ought not to be read. Furthermore in that case, by agreement of counsel the information was read to the jury with the verification omitted.

In the last case on the point, State v. Trout (Mo. Div. 2) 116 SW. (2d) 103(2), the record showed the prosecutor read the "information" to the jury over the defendant's objection, and the decision held it was not error. But an examination of the bill of exceptions in that case shows the only complaint made by appellant's counsel below was to the reading of the information itself. No complaint was made either there or here on appeal to the reading of the verification, if it was read.

It is our conclusion from the foregoing decisions that the prosecutor's act in reading to the jury his own affidavit vouching for the truthfulness of the charge, or more specifically, the *facts* under-

lying and constituting the charge, according to his best information and belief, · was reversible error. And it is undisputed that the point was· properly and timely raised in the trial court. This makes it unnecessary to consider the other assignments of error in appellant's brief.

For the reasons stated the judgment is reversed and the cause remanded for a new trial. All concur.