STATE of Missouri, Respondent,

v.

Danny R. WOLFE, Appellant.

No. SC 81372.

Supreme Court of Missouri,
En Banc.

Feb. 22, 2000.

As Modified on Denial of Rehearing
March 21, 2000.

Deborah B. Wafer, Asst. Public Defender, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Barbara K. Chesser, Asst. Atty. Gen., Jefferson City, for respondent.

DUANE BENTON, Judge.

Defendant Danny R. Wolfe was convicted of two first-degree murders, two counts of armed criminal action, and one count of first-degree robbery. He received two death sentences, and three terms of life imprisonment. This Court has exclusive jurisdiction of the appeal. *Mo. Const., art. V, sec. 3.* Affirmed.

## I.

On review, this Court accepts as true all evidence favorable to the State, including all favorable inferences from the evidence, and disregards all evidence and inferences to the contrary. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993); *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). This Court does not sit as a thirteenth or super juror, voting "guilty" or "not guilty" on the charge. *Grim,* at 413, 414.

On February 19, 1997, defendant went to the home of a co-worker in Camdenton, and asked to leave a bag there. Agreeing, the co-worker placed the bag in the laundry room. Another man staying at the house looked in the bag and saw what looked like a gray or white wig.

That evening, defendant went to a bar in Lake Ozark. He met Jessica Cox, introduced himself as "Danny," and played a game of pool with her. Afterward, they sat at the bar and talked.

Defendant asked Cox if she was "into drugs." She said yes. Defendant asked if she could "get rid of" some drugs for him. She agreed.

When the bar closed, defendant and Cox left in his pick-up. Defendant said that he would give her a ride home and could get her the drugs. The two then stopped by defendant's room at a motel for about 20 minutes.

Defendant said that they should go to Camdenton. He drove them to the co-worker's house, where he retrieved the bag left earlier. They then returned to the motel.

Defendant told Cox that they would have to go to Greenview to "pick up some money," but could not leave until 4:30 a.m. Cox asked defendant to take her home. Defendant replied that it would be worth her wait. She decided to stay.

Defendant took some silver handcuffs from the bag. Cox asked why he had them. Defendant said not to worry, he wasn't going to use them on her. The pair watched television and talked for about two hours.

Around 4:30 a.m. on February 20, the two drove into Camdenton. Defendant stopped at a gas station. Handing over $6, he told her to buy a pair of jersey gloves – which she bought.

They headed toward Greenview on Highway 7, by the home of Leonard and Lena Walters. After about a quarter mile, defendant pulled into a gravel road, turned the truck around, and parked facing the highway. It was about 5:15 a.m.

Defendant announced that he planned to rob the Walters, whom he described as "loaded." Defendant had been to the house before and said that the Walters had a car for sale. He had indicated that he would return with his girlfriend. Defendant instructed Cox to test-drive the car with Mr. Walters for about 15 minutes, while he would stay behind, handcuff Mrs. Walters, and rob them. Defendant told Cox to call him "Sam" around the Walters and to use "Jo–Jo" for herself.

Defendant was wearing black, shiny, parachute pants and a camouflage jacket, which he had changed into at the motel. He took out the handcuffs, put on the jersey gloves, and polished the handcuffs. Defendant gave Cox a pair of gloves that were already in the truck.

After waiting in the truck for about two hours, defendant drove back to the Wal-

ters' house and pulled into the driveway. He then knocked on the front door. Mrs. Walters came to the door, wearing what "looked like a nightgown." Defendant entered the house and came back out with Mr. Walters. They walked to a red Cadillac in front of the house.

Cox joined them at the Cadillac. Mr. Walters invited Cox to test-drive it. Defendant asked Mr. Walters if he was going along. Mr. Walters replied there was no reason to. Cox said she would appreciate it, to tell about the car. Mr. Walters then got in the front passenger seat. As Cox put the car in drive, defendant jumped into the passenger side back seat, saying, "Let's go, Jo–Jo."

Cox drove toward Greenview. Mr. Walters and defendant discussed the car. After driving a while, Cox turned around, returning toward the Walters' house.

Hearing a "loud bang," Cox swerved and glanced over to see Mr. Walters' head fall forward with blood coming out of his mouth. Defendant had shot Mr. Walters in the back of the head. Cox then saw defendant pull what looked like a gun away from Mr. Walters' head.

Defendant directed Cox to keep driving. He patted down Mr. Walters and pulled out his wallet. Opening it, he said, "This guy's loaded." Cox looked over and saw a large amount of cash.

As Cox pulled into the driveway, defendant told her to park the car where it had been earlier. Before the car fully stopped, defendant jumped out and walked straight to the house. He told Mrs. Walters that he needed to use the phone because Mr. Walters had had a heart attack.

Once in the house, defendant shot Mrs. Walters in the chest with a shotgun while she crouched in front of him. This wound did not kill her. Defendant then stabbed Mrs. Walters – once on the left side, and four times on the right side – while she begged, "Please God, no, no, no." The fatal stab was to the heart. Mrs. Walters

did not die immediately, remaining conscious for another three minutes.

Cox heard a "loud bang," "a bunch of ruckus" from the house, and then silence for about ten minutes. Defendant left the house carrying a safe, which he loaded in the back of the truck. As they left, Cox asked if defendant was going to kill her. He replied that she was his partner, so he was not going to kill her.

Defendant pulled off the road, unloaded the safe, opened it with some tools, and rummaged through it, discarding some contents but stuffing others in his pockets. Defendant then climbed into the truck and drove away. Shortly, he turned the truck around, and retrieved his tools.

Defendant then drove to a subdivision, where he had worked as a painter. Defendant said he was going to get rid of the gun. After getting a key from one house, defendant drove to another area and left the truck for about 10 or 15 minutes. When he returned, he was in painter's clothes. Cox did not see the black, nylon pants he was wearing earlier. Defendant told Cox he had thrown the gun into the lake.

Defendant then stopped by a cigarette store where he was painting later that day. The owner testified that defendant said he had to go get some paint.

After leaving the cigarette store, defendant handed Cox a large amount of cash. He said it was enough to keep her quiet; if she told the police, she would be charged as an accessory to murder; or if she got bail, she would be killed.

Cox asked to be dropped off at the hospital. There, Cox called her fiancé between 8:30 and 9:30, saying she had been kidnapped, the kidnapper had been caught, and it was all over. Cox's fiancé's truck was broken, so he told her to call her friends. Two friends testified that they received phone calls from Cox around 9:00, asking them to pick her up.

After dropping Cox off, defendant purchased paint from a supply store, at 9:12 a.m. (according to the invoice).

Cox claims she lied about the kidnapping story because her life would be in danger if she told the truth. Cox told the kidnapping story to at least three other people. The story spread and became the "talk of the town."

Later that week, a local bartender called Cox's fiancé. He said that a man resembling Cox's kidnapper had come in, and someone had recognized him and attacked him. The man attacked was, in fact, defendant. The police were called, and Cox admitted to her fiancé that she fabricated the kidnapping story.

Cox then told her fiancé that she had witnessed one, and maybe two, murders and feared for her life. She consulted an attorney. Through negotiations with the prosecuting attorney, Cox received immunity in exchange for her testimony.

Cox detailed to the police what happened to the Walters. She took them to where defendant rummaged (and left) the safe. Investigating the scene, police examined the safe, and found loose change (including quarters) and other contents strewn about the area. She showed them defendant's motel room and truck. She identified the house where they picked up the bag. She confirmed a photograph of defendant. She pointed out the subdivision where defendant changed clothes.

When defendant was arrested, three sets of silver handcuffs were in his room. Defendant waived his *Miranda* rights. At the beginning of the interview, defendant was calm, showing little emotion. As police related Cox's details, defendant became nervous and apprehensive.

Police searched the subdivision where defendant changed clothes. In a storage area, they discovered a pair of black pants, and tennis shoes with the same pattern as shoeprints on the floors of the Walters' house. From defendant's truck, they

seized a pair of jersey gloves, and a pry bar.

In the dumpster at defendant's motel, police retrieved a .25 caliber cartridge, consistent with a misfire from a .25 caliber gun. Also in the dumpster were a bag with a camouflage jacket and a synthetic "wig or beard," another bag containing two boxes of .25 caliber rounds, three ring boxes, and various papers with defendant's name on them.

Mr. Walters was shot with a .25 caliber gun. A spent cartridge was found on Mr. Walters' back collar and a live round on the back seat of the Cadillac.

The Walters' bedroom was in shambles, with drawers open, items littering the room, a shotgun on the floor, and a .22 rifle laying across the bed. A live .25 cartridge lay on the kitchen floor, near a six- to eight-inch fillet knife. Footprints, in dried dirt, also appeared on the kitchen floor. Mrs. Walters' body was face down in the hallway, with cuts consistent with the fillet knife. She also had a shotgun wound to the chest.

In addition to Cox's testimony, the State called Paul Hileman, who was in the Camden County Jail at the same time as defendant. Hileman testified that defendant bragged to him about the murders, relating several details. At the time of trial, Hileman was in prison for first-degree property damage. Hileman had two prior convictions of burglary and stealing, two prior forgery convictions, and two prior interference-with-custody convictions. The defense presented two impeachment witnesses against Hileman.

The local bartender also testified that about a week before the murders, defendant offered to sell him a .25 caliber handgun. He then testified that about a week after the murders, defendant "sold" him a bag full of loose quarters.

After deliberating for 12 hours, the jury returned a guilty verdict. It later returned two death sentences, finding five statutory aggravating circumstances as to Mr. Walters, and six aggravators as to Mrs. Walters.

II.

Defendant claims that the circuit judge wrongly allowed the State to question Cox about the immunity agreement. Defendant argues that the prosecutor implied to the jury that he was monitoring Cox's testimony, knew she was testifying truthfully, and thus effectively vouched for her truthfulness.

During direct examination, Cox testified that she did not know what "immunity" was when she first spoke with her attorney, nor initially ask him about immunity as a precondition to telling her story. Cox's direct examination took 95 transcript pages, of which three or four questions mention immunity. The immunity agreement was not mentioned in direct examination.

On cross-examination, Cox noted that it was her attorney who contacted the prosecutor and obtained the immunity for her. Cox said that when she talked to the police, she understood that she would not be charged with a crime.

On redirect, the State offered the immunity agreement into evidence. Cox acknowledged reading it before giving her statement, testifying at the preliminary hearing, or being deposed.

Defense counsel objected to introduction of the agreement, renewing an earlier motion to exclude any evidence that the State's agreement was for "truthful testimony." The State responded that defense had opened the door, by inquiring about the agreement. The State further claimed that Cox's state of mind was at issue, which the agreement tended to prove.

Defense counsel countered that because the agreement specifically referenced Cox's promise to give "truthful testimony," it invaded the province of the jury, and further, improperly bolstered Cox's testimony.

The trial court overruled the objections, admitted the agreement, and allowed publication to the jury.

Cox then testified:

PROSECUTOR: Have you had an opportunity to read all of [the agreement]?

COX: Yes, sir.

Q: And did you read all of that before you signed it?

A: Yes, sir.

Q: And did you have an opportunity to ask your attorney any questions before you signed it?

A: Yes, sir.

Q: Prior to signing it and after having read that letter, were there any terms of that letter which you did not understand?

A: No, sir.

Q: Were there any terms of the immunity agreement which you did not understand?

A: No, sir.

Q: Were there any terms of the immunity agreement which you did not take seriously?

A: No, sir.

Q: After signing that letter and prior to speaking to law enforcement, did you have any doubt that you would be subject to prosecution if you did not tell the truth?

A: Yes, sir. No, sir. Can you repeat that question? I didn't quite understand it.

DEFENSE COUNSEL: Your Honor, I'm going to continue to object based on improper bolstering.

THE COURT: Overruled. You may continue ...

PROSECUTOR: When you signed that letter and before you talked to law enforcement, you read the letter and in the letter – everyone has read it now and you just read it, and it states that you'll be prosecuted if you don't tell the truth?

A: Correct.

Q: Did you have any doubt that was true?

A: No.

DEFENSE COUNSEL: Objection.

[BENCH DISCUSSION HELD]

\* \* \* \*

COURT: Overruled.

\* \* \* \*

A: No, I had no doubt.

Q: Did you have any doubt that if you lied, as the letter states, the deal was off?

A: I had no doubt.

On recross, Cox stated that as part of the deal, she had to satisfy the prosecutor. Cox acknowledged that the agreement stated that she could answer the same question with the same answer, regardless of how many times it was asked, as long as she told the truth.

### Vouching

Although defense counsel never specifically objected to "vouching" at trial, she did renew a pre-trial motion that raised the issue of vouching. Vouching – sometimes called "personal vouching" – occurs when a prosecutor implies that he or she has facts that are not before the jury for their consideration. *State v. Mease*, 842 S.W.2d 98, 109 (Mo. banc 1992), *cert. denied* 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993).

That did not occur here. The jury had all the facts about the immunity agreement. After all, an immunity agreement not only supports the witness' credibility by showing an interest to testify truthfully, but also impeaches the witness' credibility by showing an interest in testifying favorably for the government, regardless of the truth. *United States v. Drews*, 877 F.2d 10, 12 (8th Cir.1989). By the end of Cox's testimony, the jury could consider her credibility in light of the agreement. *See*

*State v. Hanes,* 729 S.W.2d 612, 618 (Mo. App.1987).

Defendant invokes the Sixth Circuit's opinion in *United States. v. Francis,* 170 F.3d 546 (6th Cir.1999). There, the prosecutor explained during opening statement that if two witnesses testified truthfully, she would recommend lighter sentences for them. *Id.* The prosecutor told the jury that her recommendation depended on whether she personally believed them. *Id.* at 551. During direct examination, the prosecutor questioned one witness in detail about the negotiation of the plea agreement, emphasizing that the agreement materialized only after the prosecutor believed the witness. *Id.* The *Francis* court, however, concluded that the testimony about agreements might have been "harmless error" if it were the only prosecutorial impropriety in that case. *Id.* at 552 n. 2. *See United States v. Kroh,* 915 F.2d 326, 331–32 (8th Cir.1990) (en banc).

Here, Cox already had a full grant of immunity and was not subject to the prosecutor's recommendation in a pending case. During opening statements, the prosecutor mentioned, only once in passing, that Cox had "full immunity for her complete cooperation and truthful testimony." Moreover, the prosecutor never elicited details of the negotiation, or related his personal belief in her account of the murders. The prosecutor did not state that her immunity was subject to his independent judgment of whether she was telling the truth.

Nor is this case like *State v. Bohannon,* 361 Mo. 380, 234 S.W.2d 793 (1950). *Bohannon* prohibits the prosecutor from reading to the jury the charges and the jurat – the prosecutor's affidavit – stating that the facts in the information were true, according to the prosecutor's best information and belief. *Id.* at 797. In this case, the prosecutor did not directly vouch for the truthfulness of the charge.

*Bolstering*

The specific objection at trial was for "improper bolstering." Improper bolstering occurs when an out-of-court statement of a witness is offered solely to duplicate or corroborate trial testimony. *State v. Ramsey,* 864 S.W.2d 320, 329 (Mo. banc 1993), *cert. denied,* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). However, if the out-of-court statement is offered for relevant purposes other than corroboration and duplication – such as rehabilitation – there is no improper bolstering. *Id.*

Defense counsel cross-examined Cox in detail (for 105 transcript pages) in an attempt to impeach her credibility. Four impeachment witnesses testified against Cox's reputation in the community for truthfulness.

The State was entitled to attempt to rehabilitate her on redirect examination. The introduction of the agreement was not improper bolstering. *See United States v. Willis,* 997 F.2d 407, 415 (8th Cir.1993).

*Publication*

Defendant also complains that the trial court erred in allowing each member of the jury to view a copy of the agreement. Jury examination of evidence is within the sound discretion of the trial court. *Nugent v. Owens Corning Fiberglas, Inc.,* 925 S.W.2d 925, 931 (Mo.App. 1996), citing *Sparks v. Consolidated Aluminum Company,* 679 S.W.2d 348 (Mo. App.1984). *See also State v. Roberts,* 948 S.W.2d 577, 596–97 (Mo. banc 1997) (sending exhibit to jury during deliberation is within discretion of trial court). An abuse of discretion exists only if the trial court's decision was clearly against reason and resulted in an injustice to defendant. *Id.* That did not happen here.

### III.

While cross-examining Cox, defense counsel requested to question her about fabricating a kidnapping story when she was 12 years old, which resulted in another

person's arrest. The trial court did not allow the inquiry. Defendant believes this evidence would have impeached Cox's credibility.

■ Trial courts have discretion to determine the relevancy of evidence, and appellate courts will reverse that determination only upon a showing of abuse of discretion. *State v. Shurn,* 866 S.W.2d 447, 457 (Mo. banc 1993).

■ An adverse party may ask a witness about prior criminal convictions, whether felony or misdemeanor. *Section 491.050 RSMo 1994.*[1] A witness' credibility may not be impeached with evidence of a mere arrest, investigation, or criminal charge, not resulting in a conviction. *State v. Wise,* 879 S.W.2d 494, 510 (Mo. banc 1994). A witness cannot be impeached by proof of a bad reputation for morality or proof of any specific act indicating moral degeneration. *State v. Williams,* 337 Mo. 884, 87 S.W.2d 175, 182 (1935). The impeaching testimony should be confined to the real and ultimate object of the inquiry, which is the reputation of the witness for truth and veracity. *Id.* In other words, specific acts of misconduct, without proof of bias or relevance, are collateral, with no probative value.[2]

■ As for bias, the general ban on impeachment of witnesses through proof of prior (unconvicted) misconduct has three exceptions: where the inquiry shows (1) a specific interest; (2) a possible motivation to testify favorably for the State; or (3) an expectation of leniency. *State v. Lockhart,* 507 S.W.2d 395, 396 (Mo.1974).

None of the "bias" exceptions apply here. First, the alleged prior incident does not demonstrate a specific interest of Cox in the present case. The juvenile incident did not demonstrate a specific bias against defendant. *See State v. Johnson,*

700 S.W.2d 815, 817 (Mo. banc 1985), *cert. denied,* 476 U.S. 1119, 106 S.Ct. 1980, 90 L.Ed.2d 663 (1986) (bias of accusing witness is never irrelevant); *State v. Hedrick,* 797 S.W.2d 823, 827 (Mo.App.1990) (or collateral).

Second, the juvenile incident is not evidence of a possible motive to testify favorably for the State, based on past arrest, investigation, or charge. *See State v. Simmons,* 944 S.W.2d 165, 179–80 (Mo. banc 1997), *cert. denied,* 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997).

■ Third, although Cox received immunity in the present case, it did not relate to her acts as a 12–year–old. Moreover, it is not error to exclude offers to impeach on immaterial or collateral matters. *State v. Taylor,* 486 S.W.2d 239, 244 (Mo.1972).

■ As for relevance, the trial court properly exercised its discretion in excluding evidence of Cox's fabrication of a kidnapping story when she was 12 years old. As Cox was about 23 at the time of trial, over 10 years had passed since she supposedly lied about being kidnapped as a child. The juvenile incident was collateral to the issues in the trial, and too remote in time to be relevant. *See State v. Brotherton,* 266 S.W.2d 712, 715 (Mo.1954); *State v. Nasello,* 325 Mo. 442, 30 S.W.2d 132, 140 (1930).

■ The dissenting opinion relies on *State v. Williams,* 492 S.W.2d 1, 6–7 (Mo. App.1973) to argue that a false report to police is admissible regardless of how remote in time. In *Williams,* the false report occurred "recently" before trial. *Id.* at 3. False reports to police are evaluated for relevance the same as other evidence. The trial judge did not abuse her discretion in refusing to admit evidence of the juvenile incident.

---

1. All statutory citations are to RSMo 1994, unless otherwise indicated.

2. The rules on proof of uncharged misconduct by a defendant are different. *See e.g. State v.* *Bernard,* 849 S.W.2d 10 (Mo. banc 1993); *State v. Dunn,* 577 S.W.2d 649 (Mo. banc 1979).

## IV.

Defendant asserts that the trial court should have prohibited the prosecutor from discussing Cox's testimony with her during an overnight recess, in the middle of her direct examination.

■■■ Prosecutors may discuss testimony with their witnesses during overnight recesses. *See State v. Rack,* 318 S.W.2d 211, 217–18 (Mo.1958); *cf. State v. Futo,* 932 S.W.2d 808, 814–15 (Mo.App.1996), *cert. denied,* 520 U.S. 1143, 117 S.Ct. 1313, 137 L.Ed.2d 476 (1997) (defendant's right to consult with counsel during overnight recess). No error occurred here.

## V.

■■■ Defendant maintains that the trial court should have excluded Paul Hileman as a witness for the State. Hileman testified that while in the Camden County Jail, defendant confessed the murders to him, in detail.

On April 14, 1997, defendant requested the State's witness list and the substance of any oral statement by defendant. About January 13, 1998, Hileman wrote a letter to a jail sergeant, describing defendant's confession.

Seven months later, on August 17, 1998, the State endorsed Hileman as a witness, informing defense counsel that defendant confessed to Hileman. On September 4, the State disclosed the letter to the jail sergeant to defense counsel. On October 19 – about three weeks before trial – the State disclosed various other letters written by Hileman, which were used to impeach him on the stand.

The State concedes that it did not timely disclose Hileman and his testimony. The State clearly violated Rule 25.03(A)(2). *See State v. Rousan,* 961 S.W.2d 831, 843 (Mo. banc 1998), *cert. denied,* 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998).

■■■ The trial court has discretion whether to impose sanctions for violation of the discovery rules. *State v. Whitfield,* 837 S.W.2d 503, 507 (Mo. banc 1992). The trial court must tailor the remedy to alleviate harm to the defense. *Id.* Rule 25.16 makes sanctions permissive, not mandatory. *Id.* An abuse of discretion exists only if the denial of a sanction results in fundamental unfairness to the defendant. *Rousan,* at 843. Fundamental unfairness exists if there is a reasonable likelihood that the failure to disclose affected the result of the trial. *Id.*

No fundamental unfairness occurred here. The trial court properly overruled defendant's motion to exclude Hileman – made about three months before trial – because defendant stated that he had enough time to investigate.

Defendant also made two subsequent motions for continuance, which were denied by the trial court. The State agreed to assist with the investigation, and defendant did not object. Defendant has not shown that any relevant evidence would have been discovered or admissible had continuances been granted. The court did not abuse its discretion in overruling these motions.

■■■ Defendant argues that he did not have sufficient time to prepare for trial. Despite the State's failure to follow Rule 25.03(A)(2), no prejudice resulted. Three months was sufficient time to prepare for Hileman's testimony. *See State v. Chambers,* 891 S.W.2d 93, 100 (Mo. banc 1994).

Further, although defendant had only three weeks' notice of the other Hileman letters, he had two months to investigate potential impeachment after Hileman's endorsement and before disclosure of the letters. That two witnesses impeached Hileman shows that there was enough time to perform an investigation. Defendant offered nothing but speculation as to other relevant evidence that, with more time, he could have produced. Likewise, during the two months between the verdict and the hearing on the motion for new trial, defendant produced no new exculpatory or impeachment evidence.

The trial court did not abuse its discretion in addressing the violation of Rule 25.03(A)(2). No fundamental unfairness occurred.

## VI.

Defendant contends that the trial court wrongly refused to compel disclosure of material that would impeach Hileman: (1) information on his uncharged crimes and (2) questionnaires from an investigation of the Camden County Jail.

### Uncharged Crimes

■ The trial court did not forbid inquiry into Hileman's past conduct. *See Simmons*, at 179, citing *State v. Joiner*, 823 S.W.2d 50, 53 (Mo.App.1991). Impeachment evidence was presented. Hileman, on cross-examination, admitted to a variety of letters, some implicating him in drug use.

Defendant asserts that he was entitled to additional "information on all uncharged crimes that could be brought against Hileman," to prove that Hileman had a bias to testify for the State in exchange for not being charged. This broad request does not specify what information is being sought, or which "uncharged crimes" the trial court should have ordered disclosed.

■ Defendant may request the trial court to compel disclosure of information on a witness, not otherwise required by Rule 25.03. *Rule 25.04*. If the request is reasonable, the court may order the State to disclose the information. *State v. Simmons*, at 179. This decision is subject to review for abuse of discretion, and reversible only if there is a reasonable likelihood that the denial affected the result of the trial. *Id.*

The court's refusal to compel further disclosure of Hileman's uncharged crimes did not affect the outcome of the trial. Defense counsel was able to impeach Hileman's testimony with evidence of his extensive convictions, drug use, lies to his probation officer (and others), and at-

tempts to tamper with a witness. More evidence of Hileman's illegal activities "could hardly have had a negative impact on the jury's view of his character given what they already knew." *Id.*

### Breen Questionnaires

Hileman mailed marijuana from inside the Camden County Jail to the local newspaper and various officials, in an attempt to expose corruption. The Highway Patrol investigated, and defense counsel received a copy of the investigation report. However, defense counsel did not receive copies of questionnaires that Sergeant Breen circulated to personnel of the Jail. Defendant claims that the questionnaires likely contained or would lead to admissible evidence against Hileman. After inspecting the questionnaires *in camera*, the trial court overruled defendant's request to examine them.

Defendant moves this Court to provide the questionnaires to defense counsel, or in the alternative, to review them to determine if they should have been disclosed at trial. (The State does not object to this Court's *in camera* review of the questionnaires.)

This Court reviews for abuse of discretion to determine if there is a reasonable likelihood that the denial affected the result of the trial. *Id.* This Court has examined the questionnaires, *in camera*, and finds no evidence (or material likely to lead to admissible evidence). *See Simmons*, at 180 n. 4. The trial court did not err in overruling defendant's motion.

## VII.

■ Defendant claims that the trial court abused its discretion by not publishing to the jury 13 letters written by Hileman to various people.

■ The decision to publish evidence to the jury is within the discretion of the trial court. *Nugent v. Owens*, at 931. An abuse of discretion exists only if the trial court's decision was clearly against reason

and resulted in an injustice to defendant. *Roberts,* at 597.

Hileman acknowledged each letter, the number of letters, and their substance. The trial court admitted them into evidence "for purposes of the record." No abuse of discretion occurred.

## VIII.

Defendant asserts that the trial court should have admitted an affidavit by a friend of Cox, stating that Cox had told her that she and two men -- not including defendant – murdered the Walters.

The friend did not appear at court. Defense counsel told the judge that she had been trying to contact the friend, but no one had seen her in weeks. Defendant orally requested a continuance. The State replied that it also could not find the friend. The trial court denied a continuance.

Defense counsel then moved to introduce the affidavit into evidence. The State objected because it never had the opportunity to question the witness, and the affidavit was not subject to cross-examination.

### Oral Motion for Continuance

 Continuance is within the sound discretion of the trial court. *State v. Thompson,* 985 S.W.2d 779, 785 (Mo. banc 1999). The ruling will be reversed only upon a very strong showing of abuse of discretion. *Id.*

By Rule 24.10(b), a motion for continuance based upon an unavailable witness must show "reasonable grounds for belief that the attendance or testimony of such witness will be procured within a reasonable time." There was no evidence that the friend could be located within a reasonable time. The trial court properly denied defendant's oral motion for continuance.

### Exclusion of Affidavit

 An affidavit may be admitted upon stipulation by both parties. *State v. Zimmerman,* 886 S.W.2d 684, 691 (Mo.

App.1994). In this case, the State "vehemently oppose[d]" the introduction of the affidavit.

Therefore, the general ban on hearsay evidence applies. On cross-examination, defense counsel asked Cox about the friend:

Q: Before the time that you went and spoke with your attorney on Thursday, did you ever tell [the friend] that you had been with two men when the Walters were murdered?

A: No, ma'am.

\* \* \*

Q: Did you see [the friend] between the time of the murders and Thursday when you go and talk to your attorney?

A: No, ma'am.

Q: You didn't see her at a convenience store or a gas station?

A: No, ma'am.

Q: Never talked to her – have you ever talked to her about these murders?

A: No, ma'am ...

 The affidavit alleged that Cox had spoken about the murders at a "Jiffy Stop" with the friend, who advised her to go to the police. Defendant claims that the affidavit contained a prior inconsistent statement by Cox. The foundation for a prior inconsistent statement is an inquiry of the witness (1) whether she made the statement and, (2) whether the statement is true. *State v. Bowman,* 741 S.W.2d 10, 14 (Mo. banc 1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 60 (1988). While defense counsel asked Cox if she made the statement, counsel never asked if the "prior inconsistent statement" was true. A proper foundation for impeachment did not occur.

 Moreover, before a document may be received in evidence, it must meet other foundational requirements, such as authentication and hearsay. *Hadlock v. Director of Revenue,* 860 S.W.2d 335, 337

(Mo. banc 1993). First, because the friend was not present to introduce or authenticate the affidavit or the statement, there was no foundation from personal information. Second, because the affidavit was an out-of-court statement itself, and contained yet another out-of-court statement, it was hearsay within hearsay. Hearsay within hearsay is admissible only where both hearsay statements are within exceptions to the hearsay rule. *State v. Sutherland,* 939 S.W.2d 373, 377 (Mo. banc 1997).

In sum, the affidavit was never subject to cross-examination. There was no opportunity to examine the statement for credibility. *State v. Logan,* 344 Mo. 351, 126 S.W.2d 256, 259 (1939). The court did not abuse its discretion in excluding the affidavit.

## IX.

Defendant argues that the court wrongly admitted evidence of three ring boxes and rings, found in the dumpster at defendant's motel. Defendant asserts that nothing linked the rings or boxes to defendant or the Walters.

■ Admission of evidence is evaluated for abuse of discretion. *Roberts,* at 596–97. The ring boxes were found with other items in the dumpster that were associated with the defendant and linked to the murders.

■ If evidence is logically relevant to a fact in issue, it may be admissible if its probative value outweighs its prejudice. *State v. Gray,* 887 S.W.2d 369, 386 (Mo. banc), *cert. denied,* 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995). Here, the probative value outweighed any prejudice to defendant.

■ Although no direct evidence linked the rings or ring boxes to the Walters, they were admissible because they were found with other evidence. The general ban on evidence of uncharged crimes or wrongful acts does not bar evidence of the circumstances or the sequence of events surrounding the offense charged.

*State v. Morrow,* 968 S.W.2d 100, 107 (Mo. banc), *cert. denied,* 525 U.S. 896, 119 S.Ct. 222, 142 L.Ed.2d 182 (1998). This evidence is admissible to present a complete and coherent picture of the events that transpired. *Id.*

Finally, any prejudice was minimal, as the State did not dwell on the rings or ring boxes, at any time during trial. *See State v. Wright,* 582 S.W.2d 275, 279 (Mo. banc 1979). No abuse occurred.

## X.

■ Defendant claims the trial court wrongly allowed the State, during the guilt phase, to argue that (1) there was no evidence that Cox had been listening to a police scanner at the "safe house," and (2) that the jury should place themselves in Cox's position when considering how she "handled" the situation. Both points were preserved.

### *Police Scanner at the Safe House*

Cox's cross-examination included this exchange:

DEFENSE COUNSEL: Was there a scanner available at the safe house?

COX: I believe so, yes.

DEFENSE COUNSEL: And you were able to hear some of the investigation that was going on?

COX: Yes.

Defense counsel then summarized in closing argument, "She listens to a scanner that is there and is able to hear of the investigation and arrest of [defendant]." In rebuttal, the State argued, "There was no evidence that Jessica Cox was at the safe house listening to a scanner about the details of the investigation." Defense objected, but was overruled.

■ The State concedes error. Review, however, is not for error, but for prejudicial error. *State v. Walls,* 744 S.W.2d 791, 797–98 (Mo. banc), *cert. de-*

*nied* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988).

First, defense counsel misstated the evidence as well. Cox was able *to hear only* "some of the investigation."

Second, defendant was not prejudiced by the prosecutor's misstatement of the evidence. Before going to the safe house, Cox told the same basic story as at trial about defendant, the crimes, the crime scene, and other related scenes.

Defendant frames the misstatement of evidence as a constitutional violation (due process, confrontation clause, right to present a defense, right to access justice through the courts of Missouri, right to a reliable verdict and sentencing, cruel and unusual punishment). Under *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), this Court has the duty to decide whether the prosecutor's comments resulted in error that was harmless beyond a reasonable doubt. *State v. Kilgore*, 771 S.W.2d 57, 62 (Mo. banc 1989); *State v. Dexter*, 954 S.W.2d 332, 340 n. 1 (Mo. banc 1997). This Court finds that the comments were harmless error beyond a reasonable doubt.

### Improper Personalization Claim

■ Defendant contends that the State improperly personalized the argument. In closing argument, defense counsel attacked Cox's credibility, stressing her decision not to flee defendant and the crime scene, concluding that "she got away with the murder of Lena and Leonard Walters."

In rebuttal, the State argued:

And the big question is: Why didn't Jessica try to run? And I think all of us sitting here in this comfortable courtroom with all of these officers protecting us, we could probably ask that question. Why didn't she run.. Sure, now we know he was gone for ten minutes.

You just saw that man – look at him, that man – you just saw him shoot an old man in the back of the head and he's got a gun and you're out in the middle of nowhere at Port Valero, so why don't you get up . . .

\* \* \*

Do you make a run for it or are you going to try to appease him, agree to his instructions not to go to the police, take his money to keep, quote-unquote, your mouth shut? . . .

Defense counsel objected, as improper personalization. The judge overruled the objection.

■ The use of the word "you" does not necessarily mean improper personalization. *State v. Richardson*, 923 S.W.2d 301, 323 (Mo. banc 1996). The prosecutor's use of the word "you" has no special significance when the argument is considered in context. *Id.*

An argument is personalized only when it suggests a personal danger to the jury or their families. *State v. Rhodes*, 988 S.W.2d 521, 528 (Mo. banc 1999). None of the prosecutor's statements suggest personal danger to the jury or their families. No error occurred.

### XI.

■ Defendant asserts that the trial court, during sentencing phase, improperly allowed into evidence a 3–foot by 4–foot "blowup" of photographs of the victims, after 8½ by 11 inch photographs had already been introduced. Defendant claims the blowup inflamed the jury's passions.

The State responded:

Yes, Your Honor, the State does intend to prejudice the defendant with these photographs. These photographs reveal the result of his conduct, and we're now to the sentencing phase of this case. The blowups of photographs which have already been admitted and passed to the jury. This will allow me to make reference to them during my argument with

them on the tripod without having to interrupt my closing by passing it.

The court overruled the objection.

During closing argument, the State referred to the blowup, "And I don't show you this photo to gross you out. You've actually already seen it, but I don't want to have to pass it around to everybody. But when you're deciding what the appropriate punishment is for Mr. Wolfe, you have to remember what he did, what he left behind."

■ Gruesome crimes produce gruesome, yet probative, photographs, and a defendant may not escape the brutality of his own actions. *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc), *cert. denied* 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991).

■ The issue is relevance, which lies in the trial court's discretion. *State v. Shaw*, 636 S.W.2d 667, 672 (Mo. banc), *cert. denied*, 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982). Photographs may be used in the sentencing phase of a capital case to establish the aggravating circumstances. *State v. Brooks*, 960 S.W.2d 479, 501 (Mo. banc), *cert. denied*, 524 U.S. 957, 118 S.Ct. 2379, 141 L.Ed.2d 746 (1997); *State v. Sandles*, 740 S.W.2d 169, 177 (Mo. banc), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1303, 99 L.Ed.2d 513 (1987).

Because the jury had already seen smaller versions of the photographs during the guilt phase, and because they served legitimate purposes in closing argument, there was no abuse of discretion.

## XII.

Defendant objects to the definition of "reasonable doubt" in MAI–CR3d 302.04 and 313.30A. This Court again rejects this argument. *State v. Harris*, 870 S.W.2d 798, 811 (Mo. banc), *cert. denied*, 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994).

## XIII.

■ This Court determines whether: (1) the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) the evidence supports the finding of a statutory aggravating circumstance; and (3) the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering the crime, strength of the evidence, and the defendant. *Section 565.035.3(1) – (3)*.

After independent review of the record, this Court finds that the death sentences in this case were not imposed under the influence of passion, prejudice, or any other arbitrary factor.

This Court further determines that the evidence supports the statutory aggravating circumstances. In this case, the jury found the following statutory aggravating circumstances as to Leonard Walters: (1) murder committed while engaged in another murder; (2) murder committed for purpose of obtaining money or things of monetary value; (3) murder committed during first-degree robbery; (4) murder committed because of potential witness status; and (5) defendant had one or more serious assault-style criminal convictions. The following statutory aggravating circumstances were found as to Lena Walters: (1) murder committed while engaged in another murder; (2) murder committed for purpose of obtaining money or things of monetary value; (3) murder committed during first-degree robbery; (4) murder committed because of potential witness status; (5) defendant had one or more serious assault-style criminal convictions, and (6) murder involved depravity of mind, and was outrageously and wantonly vile, horrible and inhuman.

■ Finally, this Court determines that the death sentences were not excessive or disproportionate to the penalties imposed in similar cases. The issue in proportionality review is not whether any similar case can be found where the jury imposed a life sentence, but rather wheth-

er the death sentence is excessive or disproportionate in light of similar cases. *State v. Parker*, 886 S.W.2d 908, 934 (Mo. banc), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1994); *State v. Shurn*, 866 S.W.2d 447, 468 (Mo. banc), *cert. denied*, 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1993); *State v. Mallett*, 732 S.W.2d 527, 542 (Mo. banc), *cert. denied*, 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987).

As in *State v. Barnett*, 980 S.W.2d 297, 310 (Mo. banc), *cert. denied*, 525 U.S. 1161, 119 S.Ct. 1074, 143 L.Ed.2d 77 (1998), defendant deliberately attacked, killed and robbed an older couple in their own home, showing a callous, deliberate disregard for human life. *See also State v. Walls*, 744 S.W.2d 791 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Mathenia*, 702 S.W.2d 840 (Mo. banc), *cert. denied*, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986); *State v. Battle*, 661 S.W.2d 487 (Mo. banc), *cert. denied*, 464 U.S. 1306, 104 S.Ct. 567, 78 L.Ed.2d 538 (1983).

This Court has upheld death sentences where the defendant murdered multiple victims, for pecuniary gain, to eliminate possible witnesses, or to burglarize the victim's home. *State v. Parker*, 886 S.W.2d 908, 916 (Mo. banc 1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995); *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989); *State v. Murray*, 744 S.W.2d 762 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Schneider*, 736 S.W.2d 392 (Mo. banc 1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988); *State v. Lingar*, 726 S.W.2d 728 (Mo. banc), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987); *State v. Bucklew*, 973 S.W.2d 83 (Mo. banc), *cert. denied*, 525 U.S. 1082, 119 S.Ct. 826, 142 L.Ed.2d 683 (1998).

In numerous other cases, the death penalty was imposed on defendants who mur-

dered more than one person. *State v. Johnson*, 968 S.W.2d 123 (Mo. banc), *cert. denied*, 525 U.S. 935, 119 S.Ct. 348, 142 L.Ed.2d 287 (1998); *State v. Clemons*, 946 S.W.2d 206 (Mo. banc), *cert. denied*, 522 U.S. 968, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997); *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc), *cert. denied*, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1993); *State v. Mease*, 842 S.W.2d 98 (Mo. banc), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1992); *State v. Hunter*, 840 S.W.2d 850 (Mo. banc), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1992); *State v. Ervin*, 835 S.W.2d 905 (Mo. banc), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1992); *State v. Powell*, 798 S.W.2d 709 (Mo. banc), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1990); *State v. Reese*, 795 S.W.2d 69 (Mo.banc), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1025, 112 L.Ed.2d 1106 (1990); *State v. Sloan*, 756 S.W.2d 503 (Mo. banc), *cert. denied*, 489 U.S. 1040, 109 S.Ct. 1174, 103 L.Ed.2d 236 (1988); *State v. Young*, 701 S.W.2d 429 (Mo. banc), *cert. denied*, 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1985).

In addition, a sentence of death was upheld when the murder involved acts of brutality and abuse that showed depravity of mind. *State v. Kinder*, 942 S.W.2d 313 (Mo. banc), *cert. denied*, 522 U.S. 854, 118 S.Ct. 149, 139 L.Ed.2d 95 (1996); *State v. McMillin*, 783 S.W.2d 82 (Mo. banc), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990); *State v. Sidebottom*, 753 S.W.2d 915 (Mo. banc), *cert. denied*, 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988); *State v. Walls*, 744 S.W.2d 791 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Roberts*, 709 S.W.2d 857 (Mo. banc), *cert. denied*, 526 U.S. 1013, 119 S.Ct. 1160, 143 L.Ed.2d 225 (1986).

The dissenting opinion compares this case to *State v. Chaney*, 967 S.W.2d 47 (Mo. banc), *cert. denied*, 525 U.S. 1021, 119 S.Ct. 551, 142 L.Ed.2d 458 (1998). There, this Court held the death sentence dispro-

portionate because "the strength of the evidence" was not comparable to evidence in similar cases imposing the death penalty, and "the defendant" had no prior convictions. *Id.* at 60. In this case, there is an eyewitness, contrary to *Chaney*'s express reliance on the absence of an eyewitness. *Id.* Also, the defendant here has a criminal record: two convictions of second-degree burglary, one conviction of felony stealing, and one conviction of armed robbery.

Defendant filed a "motion for examination and evaluation of procedures and methods utilized for the Court's proportionality review under section 565.035." The State filed a motion to strike this motion. Both motions were taken with the case, and both are now overruled.

■ Contrary to defendant's motion, this Court's proportionality review is constitutional. Proportionality review is not constitutionally mandated, *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), and this Court has repeatedly rejected identical claims. *State v. Rousan*, 961 S.W.2d 831, 854–55 (Mo. banc 1998). Proportionality review is an additional safeguard against arbitrary and capricious sentencing and promotes the even-handed, rational, and consistent imposition of death sentences. *Id.* at 855. Missouri's statute is constitutional. *Id.* at 855.

Affirmed.

PRICE, C.J., LIMBAUGH, COVINGTON and HOLSTEIN, JJ., concur.

1. Perhaps it is a minor point but the record shows that Wolfe spells his first name Dannie—contrary to the spelling used by the state, counsel, and the principal opinion.

2. *State v. Grim*, 854 S.W.2d 403, 413–414, (Mo. banc 1993), cited by the principal opinion for the proposition that this Court "does not sit as a thirteenth or super juror," is not a death penalty case and should not be used to denigrate our statutory duty under section

WOLFF, J., dissents in separate opinion filed.

WHITE, J., concurs in opinion of WOLFF, J.

WOLFF, Judge, dissenting.

Without the testimony of Jessica Cox there would be no case against Dannie Wolfe [1] for the murders of Lena and Leonard Walters. None of the physical evidence links Dannie Wolfe to these killings. One of the victims, Leonard Walters, was seen alive by a disinterested and reliable witness in the morning and the afternoon of the day on which Mr. Walters had supposedly been murdered earlier in the morning. The central factual issue is the credibility of Jessica Cox. The trial court improperly kept from the jury critical evidence calling into question Ms. Cox's credibility. The trial court's rulings effectively precluded Wolfe from presenting a defense and denied him the right to a fair trial. There is a substantial possibility that Wolfe did not commit these crimes. I therefore dissent.

### Our Factual Review

In order to highlight the error of the trial judge's critical rulings, a summary of the facts is necessary. The principal opinion only sets forth the facts that are consistent with the jury's verdict, giving due deference to the jury's role. Because the jury could very well reach a different decision, if it were more adequately informed, a more complete summary of the record is necessary to show that Wolfe was prejudiced by the trial court's rulings. Moreover, a full review of the evidence is required in this death penalty case under section 565.035 to assess the "strength of the evidence." [2]

565.035.3(2) to consider the strength of the evidence when determining whether the death sentence is appropriate. *State v. Dulany*, 781 S.W.2d 52 (Mo. banc 1989), is a death penalty case, but there was not an issue as to the strength of the evidence under section 565.035.3(2). This Court also is specifically directed, in death penalty cases, by section 565.035.7 to assess the "factual substantiation of the verdict." In most cases, the standard

## Facts

On Wednesday afternoon, February 19, 1997, Jessica Cox went to Slick's Bar in Lake Ozark to have drinks. Ms. Cox, who was a barmaid at Eddy's Bar, and her fiancé, Allen Fair, a seasonal construction worker, were in a pool league on Wednesday nights. Fair and two other friends, Scotty Gift and Brian Beard, also in the pool league, were meeting at Slick's. The four then drove to a bar in Eldon, and after they finished playing pool, they all went back to Slick's. Later in the evening, Fair decided to go home since he had to get up to work the next morning. Ms. Cox stayed at the bar with Scotty Gift and Brian Beard, who left the bar about 11:30 p.m. About midnight, Ms. Cox left Slick's and walked over to Mona's Bar. At Mona's, she played pool with a friend from work. Then she was introduced to and played pool with the defendant, Dannie Wolfe.

Wolfe, who was age 46 at the time, worked as a self-employed painter under the business name "ProPainter." He has a criminal record of burglary, stealing, and armed robbery that runs from 1968 to 1988—the record shows convictions for second degree burglary in 1968, felony stealing over $50 in 1971, second degree burglary in 1976 and 1977, and armed robbery in 1988. His last conviction in 1988 resulted in a six-year prison sentence. He has a drug and alcohol problem for which he had been attending treatment in the time period when he met Ms. Cox in the bar.

After being introduced and playing pool, Wolfe and Ms. Cox went over to the bar to talk. According to Ms. Cox, Wolfe asked her if she was into the drug scene and if she did drugs. She responded that yes, she did get high. Wolfe then asked if she would be interested in selling some drugs for him. She again responded yes. She told Wolfe that she needed a ride home. He told her that he would give her a ride home after he had given her the drugs. They left the bar near closing time, around 1:15 a.m.

They drove in Wolfe's pickup truck for about 20 to 25 minutes to his motel room at the Williamsburg Inn.[3] At the motel, Ms. Cox said they watched television and they talked. After about 20 minutes they left the motel and went to Camdenton to the home of Wolfe's friend, Chris Young, to pick up a bag Wolfe had left there, which he said contained "weed," because they wanted to get high.

Jessica Cox and Dannie Wolfe drove back to the motel, arriving about 2:30 a.m. According to Wolfe's statement to the police, Ms. Cox and Wolfe stayed in his motel room the rest of the night. In his statement, Wolfe declined to say whether or not he and Ms. Cox had sex, although both admit to kissing. At 7:00 a.m., according to Allen Fair, Ms. Cox's fiancé, Ms. Cox called him from a pay phone in the Osage Beach area—the time and origin of the call were shown on Fair's caller ID. Ms. Cox told Fair that she had been kidnapped by a man, that she was at the hospital for tests, and that the man had been arrested.

Fair testified that he was upset with her. He told her that his truck was not working so he could not pick her up. Ms. Cox eventually called another friend, and

---

used by the principal opinion is correct, but where, as here, an examination to determine the prejudice to Wolfe in the trial court's rulings, as well as to determine whether this verdict is supported by sufficiently strong evidence to justify a death sentence, a more complete review of the record is required. See discussion in the section of this opinion headed "This Court's Independent Review," *infra.*

**3.** Throughout the record the Williamsburg Inn is referred to as a hotel or motel. According to Ms. Cox's testimony, there was a hallway, living room, bedroom, and kitchenette and it appeared that Wolfe was staying there because there were clothes and children's toys on the floor. The Williamsburg Inn register, admitted into evidence, shows that Dannie Wolfe had rented the unit for the month of February. He paid $450.00 for the month. A previous residence was a homeless shelter.

she told the friend that she had been kidnapped. This friend could not pick her up, but Scotty Gift, one of the pool players, and another friend would come by and pick her up. Once they arrived, she told them that she had been kidnapped and elaborated on her story: Ms. Cox said she had asked this man for a ride home and that he ended up passing the road to her home and took her to his cabin on D road. He handcuffed her when she was in the car. Once in the cabin the kidnapper, whose name was "Frank," then tied her up with loose fabric. Further, she said she had hurt her head getting out of the car and that is why the hospital did tests. She told her friends that she got away and stole the man's wallet. In at least one version of the story, she escaped from being tied up when "Frank" went to get more men to have sex with her. She said the police had already apprehended the kidnapper, whose description matched that of Dannie Wolfe.

After she told her fiancé and others this false kidnapping story, the story became the talk of the town.

Allen Fair said that Greg Addington, the bartender at Slick's and a friend of Fair, called Fair to say that the "kidnapper" had been in the bar. Someone had recognized him from the description Ms. Cox had given and began to beat him up. Addington stopped the fight. Wolfe gave him identification proving his name was Dannie Wolfe and not "Frank," the name Ms. Cox had given as that of her kidnapper. Addington was suspicious of Ms. Cox's story and called the police and the hospital to check to see if her story was true. The story was false. According to Ms. Cox, Fair confronted her about the story, probably while Addington was still on the phone. Fair testified the call from Addington was on late Saturday night, while Ms. Cox said the call occurred late Friday evening. When confronted with Addington's news, Ms. Cox told her fiancé that

she had witnessed a murder, but did not tell him any specific details. Fair did not ask for any details, but told her to go to an attorney or to the police.

The bodies of Lena and Leonard Walters were found on Sunday, February 23, 1997, about noon. The coroner, Dr. Jungles, examined the bodies at the scene around 1:00 p.m. Lena Walters' body was inside the house. She had been shot with a shotgun and stabbed a number of times. Dr. Jungles, who is a physician, started with Lena Walters' body because the temperature in the house was more stable than outside, where Leonard Walters' body was discovered in his car. Dr. Jungles' preliminary observation was that the time of death was 24 to 36 hours prior to Sunday afternoon, with 36 hours being the maximum.

As a guide for determining time of death, Dr. Jungles assessed the bodies' *rigor mortis*. *Rigor mortis*, according to the testimony, sets in about two hours after death, peaks at 18 hours or so, and then gradually leaves the body 24 to 36 hours after death. Based on the status of the *rigor mortis*, Dr. Jungles' judgment was that the Walters had been dead for 24 to 36 hours. The forensic pathologist, Dr. Dix, did not make any determination as to the time of death. After the state adopted the theory that Dannie Wolfe had murdered the couple early Thursday morning, both doctors testified that the time of death would not be inconsistent with the state's theory, though Dr. Jungles' clinical observations at the scene led him to estimate the time of death as probably no earlier than early Saturday morning.

On Thursday, February 27, Ms. Cox went to see an attorney who called the prosecuting attorney offering Ms. Cox's story in exchange for immunity. The prosecutor and Ms. Cox, through her attorney, entered into an immunity agreement that day.[4] Two officers briefly inter-

---

4. In his motion for rehearing, Wolfe for the first time raises the contention that the prose- cuting attorney has no authority under Missouri law to grant immunity, citing our deci-

viewed Ms. Cox at the attorney's office. One officer testified that they did not receive details from Ms. Cox at that time. She told the officers where the safe was and took them to locations Ms. Cox said she and Wolfe had been.

Ms. Cox testified that she listened to a police scanner, read the newspaper about the murders, and spoke with officers about the investigation. She testified that her story on Saturday, March 1, the day of her videotaped statement, had more elaborate details than her two earlier statements; one of her statements was not recorded and the other was recorded but erased by the officer who had taken it.

At *trial*, Ms. Cox testified as follows: When she and Dannie Wolfe returned to the Williamsburg Inn, his motel, arriving around 2:30 a.m., Wolfe told her that they had to wait a while before they could pick up some money in Greenview. At this point, Ms. Cox said she asked him to take her home. He told her that she should wait because it would be worth it. They continued to talk and Wolfe ate. Wolfe took handcuffs out of the bag that he had picked up earlier, but he told her not to worry. At some point, Wolfe changed into black nylon pants, a red sweatshirt, and a camouflage jacket. They left the motel about 4:30 a.m. to go to Greenview.

On the way, Wolfe stopped at an Amoco station and asked Ms. Cox to buy sodas and a pair of jersey gloves.[5] (There was no evidence of such purchases.) Wolfe then drove to the Walters' home and passed it, indicating to Ms. Cox that that was the home he intended to rob. She was familiar with the home and the Greenview area because she passed there to get to her mother's home, which she visited a couple of times a week. Wolfe parked his truck off the gravel road and told Ms. Cox that he was planning to rob the couple. It was about 5:15 a.m. Wolfe told Ms. Cox that he wanted her to test drive the car for 10 or 15 minutes and take the old man with her and he was going to stay with the woman. He told her to use the name "Jo–Jo" and to call him "Sam." Wolfe said that he had been to the house earlier and told them he would be back with his girlfriend. They stayed on the side of the road for about two hours, and Wolfe slept part of the time. While he was sleeping, Ms. Cox said she concocted a plan to take Mr. Walters to the nearest phone to call police. When it was time to go to the house, Wolfe had given her a pair of "purple grayish fuzzy gloves" to wear that were already in the truck. (No such gloves were recovered.)

When they pulled up to the home, Wolfe got out of the truck and went to the front door. Both Mr. and Mrs. Walters came to the door, she in a nightgown and he putting up one strap of his overalls. (No nightgown was found at the scene.) Walters and Wolfe walked to the car, and Ms. Cox got out of the truck and went over to the car. The car did not start, so Wolfe and Walters jump-started it. Wolfe asked if Mr. Walters was going to go with Ms. Cox on the test drive. When he replied that there was not any reason for him to go, Ms. Cox encouraged Walters to go with her to describe the car. He did.

When she had put the car in drive, Wolfe jumped into the back seat saying, "Let's go, Jo–Jo," or perhaps simply, "Let's go." Ms. Cox said she was in the car a total of about 20 minutes, and that Mr. Walters discussed different features of the car. She was not able to recall any

sion in *State ex rel. Munn v. McKelvey*, 733 S.W.2d 765, 768–769 (Mo. banc 1987). It seems possible that defense trial counsel wished to use the immunity agreement to cross-examine Ms. Cox, and thus the failure to object may have been strategic. Obviously, as well, this Court has not reached the issue of whether the immunity agreement violated Rule 4–3.4(b) of the Rules of Professional Conduct by allegedly offering "an inducement to a witness that is prohibited by law," and, if so, whether the trial judge should have intervened even absent an objection.

5. A kind of work glove used in many occupations.

specifics about the interior nor any of the features of the car.

As she was heading back toward the house, Ms. Cox heard a loud bang, looked over and saw Wolfe pulling what looked like a gun from the back of Walters' head. Walters leaned forward and a "bunch of blood" came out of his mouth. Ms. Cox said that Wolfe then leaned forward over the front seat and was patting Mr. Walters down looking for his wallet, which he found. According to Ms. Cox, Wolfe said, "this guy's loaded." When Walters' body was found, the wallet was in the front of the overalls without any cash in it.

When they returned to the residence, Wolfe told Ms. Cox to put the car in the same spot that it had originally been parked. As she was parking but before the car stopped moving, Wolfe jumped out of the car and went straight into the house without knocking. She went back to Wolfe's truck, rolled the window down a couple of inches and smoked a cigarette. While waiting, she heard a "ruckus" and a "loud bang." She did not hear anything for ten minutes. Wolfe came out of the house carrying a safe, which he put in the truck. As they were driving away, Cox asked if Wolfe planned to kill her, and he responded that she was his partner.

Wolfe drove down a little farther from the Walters home, stopped and took the safe down into the woods. According to Ms. Cox's trial testimony, Wolfe opened the safe with a crowbar and screwdriver. Once open, he put the contents in his pockets, then pushed and kicked the safe down the hill. He got back into the truck and drove away, but had forgotten his tools and drove back to get them.

Wolfe then drove to a subdivision area known as Port Valero by Lake of the Ozarks. He went down to a storage area but did not have the key. He went to get the key a few houses down from the man who had hired him for a painting job. This man testified that Wolfe did come by and get the key and that they had coffee together for about 15 or 20 minutes.

According to Ms. Cox, Wolfe came back to the truck in about five or six minutes. After he got the key, he went back to the shed and was gone an additional ten minutes, Ms. Cox said. He had changed into his painting clothes. He also told her that he had thrown the gun into the lake. (No gun was recovered.)

They then drove back to Camdenton to a cigarette store that he was supposed to paint. At one point, Ms. Cox testified they arrived at the store around 9:00 a.m. Wolfe told her he was going in to tell the owner that he had to pick up paint and that he could then take her home. There was testimony that Wolfe did pick up paint and the invoice documents the time at 9:12 a.m. After Wolfe got out of the cigarette store, Ms. Cox said he drove toward Osage Beach and gave her $540. Wolfe told her that the money should keep her mouth shut and she would be killed if she went to the police. He told her that he was going to go out of town for a couple of weeks to California.[6]

Ms. Cox asked to be dropped off at the hospital because she did not want him to know where she lived. She said she arrived at the hospital around 8:30 or 9:00 a.m. She said she called her fiancé from the hospital around 9:30 a.m.—contrary to his testimony that it was 7:00 a.m.—and told him that she had been kidnapped and that the police officers were done with her and she could go home.

6. Dannie Wolfe did not go to California. In the days that followed his encounter with Ms. Cox, unlike Ms. Cox, Wolfe was able to tell police his whereabouts. He finished his painting on Thursday and received a payment check, rented a moving truck and drove to Kansas City to pick up his girlfriend, drove to Liberty, Missouri to pay court tickets, and returned to Lake Ozark. His girlfriend decided not to move to Lake Ozark as she had originally planned, so Wolfe brought the rented truck back early and received a refund of some of the rental fee.

Some days after the discovery of the Walters' bodies, but before Jessica Cox went to an attorney, Ms. Cox, according to an affidavit executed by a former roommate, told the former roommate that she had been a witness to a murder of a man in Greenview and that Ms. Cox had been with two individuals, one named Brian and the other one named Eric. The affidavit also stated that Ms. Cox said that she and the two men had gone to the house to steal a large amount of money, either $20,000 or $50,000, and that the two men were still at Ms. Cox's home. The former roommate's affidavit further states that she told Ms. Cox that she needed to go to the police and to get the men out of her house.

This affidavit was obtained by the defense prior to trial, and the affiant was subpoenaed for testimony at trial as the defense's last witness, but she did not appear. The defense's request for a brief continuance to locate the witness was denied. Ms. Cox denied making these statements and the defense was precluded from using the affidavit for impeachment.

On Monday, February 24, the day after the bodies were discovered, after hearing the news of the Walters' killings, a disinterested witness, Robert Morgan, told police that he was a friend of Leonard Walters and saw Walters twice on Thursday, February 20, 1997, the day Ms. Cox said Walters was murdered. Morgan recalled having coffee with Walters on Thursday morning in a coffee shop where Morgan stopped on the way to the hospital to see his wife. Morgan also testified that it was well known in the Greenview area that Walters was wealthy and carried a lot of cash.

On the same day that he had morning coffee with Walters, Thursday, February 20, Morgan saw Walters and another man, with dark skin, standing by the car at Walters' home in the afternoon. That afternoon, he followed an ambulance that was transporting his wife to a nursing facility, and it was on his way home Thursday afternoon that he noticed Walters standing by his car. Morgan so testified, and the ambulance report and the nursing facility's sign-in logs supported his testimony as to the Thursday date. Another witness, the owner of a local meat market, recalled seeing the Walters late in the week of February 16, on Thursday or Friday, but could not exclude seeing the Walters on Wednesday.

None of the physical evidence links Wolfe to these murders. At the scene of the murders, police recovered a .25 caliber shell casing on Mr. Walters' neck and shoulder area, a live cartridge in the back seat of the car, and a live cartridge by the refrigerator in the home. There were two footprints found on linoleum in the house, an expended 12 gauge shotgun shell found in the bedroom, a 12 gauge shotgun, two shotgun shells, and a fillet knife, which apparently was used to stab Mrs. Walters either before or after she was shot with the shotgun that apparently was owned by the Walters. There was some tissue, blood, and hair in Mrs. Walters' hands, and hair was also taken from fiber in the car. None matched Wolfe's.

Law officers seized three sets of silver handcuffs, a key to the handcuffs, and a pry bar from Wolfe's motel room; they seized his toolbox, a pair of brown jersey gloves, a crowbar, a hairbrush, and floor mats from his truck. From the unlocked communal storage at Port Valero, officers recovered size 10 white tennis shoes, and a pair of jersey gloves found outside on a rock. In a condominium shed in Port Valero, officers recovered a red hooded sweatshirt and black pants. From a dumpster at the Williamsburg Inn, police recovered a box of thirty .25 caliber cartridges, a live round in front of the dumpster, a gray lock box, a bag with a camouflage jacket, a wig, and a torn check with the name "Ferry," notes and other papers with Wolfe's name on them, a black bag containing two boxes of .22 caliber ammunition (a caliber different from the .25 caliber bullet that killed Mr. Walters), and three ring boxes with rings in them (these

rings and boxes were not shown to be the Walters' property), and a piece of black hair was found in the cartridge box.

By Jessica Cox's account, and from the examination and photos of the scene, there was a lot of blood. Ms. Cox testified that after Wolfe shot Mr. Walters, he reached around from the back seat to get Walters' wallet from the front of his overalls, and that there was blood all over the front of the overalls that Mr. Walters wore. Mrs. Walters had been stabbed four to five times and had been shot with a shotgun.

Yet, significantly, there was no blood on any of the clothing that Ms. Cox said Wolfe was wearing when he committed these bloody murders—none on the camouflage jacket reportedly found in the dumpster, nor the black pants and shoes found in the sheds, nor on the sweatshirt recovered at Port Valero.

There were several strands of hair found at different locations—at the house, in the car, and in the dumpster. None of the hairs matched that of Dannie Wolfe. The hair found in one of the cartridge boxes did not match Wolfe's or either of the victims'.

Fingerprints were lifted, but did not match Wolfe's.

Nor were there any fibers found on his clothing that were identified as from the crime scene or, specifically, from the Walters' car.

The gloves that law officers recovered from Wolfe's truck and on the rock in Port Valero did not have hair, fiber, gunpowder or blood on them. A firearms expert could not say whether the cartridges recovered from the dumpster were from the same lot as the .25 caliber cartridges found at the crime scene.

A gelatin mold was made of the shoe prints found at the scene. An expert testified that the vinyl print was so fragmentary and partial that it was difficult to determine a starting point, thus she could not determine which was the heel or toe of the print. There were no individual characteristics that could be found matching the print and the shoes that were seized from the communal storage area at Port Valero. There were similar class characteristics between the shoes seized and the print at the scene, but class characteristics are secondary to individual characteristics because shoe companies often use the same sole design. Moreover, the weather in the early morning hours of February 20 was drizzly, rainy, and cold, yet the shoes that were seized were not muddy and did not have to be cleaned. The shoes that were seized were size 10; Dannie Wolfe wears size 8.

As to the safe, which was recovered in the woods, an expert noted that the tool marks on the safe would not have come from the pry bar or crow bar that belonged to Wolfe. Rather, the marks were consistent with a screwdriver, a word that was added to Ms. Cox's testimony between the time of her statement and deposition and the time of trial. In her videotaped statement, Ms. Cox describes sitting in the truck at the scene, and then "they" carried the safe out of the house and put it in the truck. Her trial testimony was that Dannie Wolfe carried the safe out by himself and put it in the truck. The size and weight of the safe do not specifically appear in the record, except that the prosecutor tells the jury in final argument that the state did not bring the safe to court, because it was too big. Photographs of the safe show it to be about the size of a single-drawer filing cabinet.

While Wolfe was in the Camden County jail, he was jailed with Paul Hileman who, as early as December 30, 1997, wrote a letter to the county jailer indicating that Wolfe had confessed to Hileman. There are a number of such letters over the months, leading up to trial, but Hileman was not disclosed as a witness until August 1998. There is some indication that when Hileman pleaded guilty in January 1998, there was an arrangement involving his

testimony against Dannie Wolfe.[7] Moreover, even after the late disclosure in August 1998, the prosecution did not turn over Hileman's letters until shortly before trial. At trial, defense counsel used the letters orally to impeach Hileman by indicating that he was testifying against Wolfe in order to get out of jail. Hileman's letters were admitted into evidence but the trial court judge refused to allow the letters to be displayed to the jury.[8] Hileman also asked Phil Dayton, who was in jail with Hileman and Wolfe, to corroborate Hileman's story about Wolfe's confession, according to Dayton's testimony.

## The Impeachment of Jessica Cox

It is difficult to doubt that Jessica Cox was a companion or accomplice in the murders of Mr. and Mrs. Walters, regardless of when those murders may have occurred, whether it was on the early morning of February 20, later that day or evening, the next day, Friday, or even the next day, Saturday. Ms. Cox, for one thing, knew where the safe was located.

The prosecution's theory was that she lied to her fiancé and others about being kidnapped because, as she testified, she "was afraid to tell [Allen Fair] because [she] was afraid to tell anybody because [she] was scared for [her] life." However, when an engaged woman goes to a motel room of a man whom she has just met in a bar and spends the night in his company, some explanation for the woman's activity may be needed, lest her fiancé draw an obvious conclusion as to what they did there. And, when the kidnapping lie is exposed, a story linking her Wednesday overnight companion to the Walters murders serves the same purpose.

What the jury did not hear was how readily Ms. Cox has lied to law enforcement authorities in the past, and how her current testimony fits the pattern of previous lies. One prior occasion excluded by the trial court was that Ms. Cox had, some ten years previously, at age 12 or 13, stolen her stepfather's truck and had an accident. After the accident she called the police and reported that she had been

7. Paul Hileman testified before the jury that he did not receive any deals on his pending charges in exchange for his testimony against Dannie Wolfe. However, in a pretrial motion to exclude Hileman as a witness due to the conceded discovery violation, his public defender testified that he had discussions with the prosecutor regarding Hileman's charges. Although Hileman's cases were scheduled to be heard in June 1998, the prosecutor instructed the public defender that the cases would be continued until after Hileman testified in Wolfe's trial. The public defender did not testify before the jury.

Additionally, the prosecutor withheld from the defense the "Breen Questionnaires," which were materials from a Highway Patrol investigation of alleged drug use in the Miller County jail that centered around charges made by Hileman. The trial court conducted an *in camera* review of the materials but did not issue a ruling. By this Court's order, the materials were sent here and reviewed. The only document that might be germane to the Wolfe case is a report dated March 20, 1998, from Sgt. T.L. Breen, the investigator, that states in part: "I had requested through the prosecutor's office to polygraph Paul A. Hileman, the witness in the case, to verify his

allegations against the jail staff.... [I]t was his (the prosecutor's) instructions that the case be suspended until further notice from his office." Reference to whether a witness did or did not take a polygraph is inadmissible, *State v. Biddle*, 599 S.W.2d 182 (Mo. banc 1980), and in the case of this particular kind of witness, the results would be highly questionable. *See* Timothy B. Henseler, Comment, *A Critical Look at the Admissibility of Polygraph Evidence in the Wake of Daubert: The Lie Detector Fails the Test*, 46 Cath. U.L. Rev. 1247, 1251–1259 (1997). The only inference that could be made is that, as of March 20, 1998, the date of Sgt. Breen's report, five months before disclosure of Hileman as a witness against Wolfe, the prosecutor planned to use Hileman. The state has conceded the discovery violation, as discussed in the text.

8. The Hileman letters were not published to the jury, including those that specifically discuss Dannie Wolfe. By contrast, the trial court judge did allow the immunity agreement between Jessica Cox and the prosecutor to be published to the jury. The court allowed a copy of the immunity agreement to be given to each juror, and the prosecutor was permitted to emphasize that the agreement required her to "tell the truth."

kidnapped, providing "extremely elaborate details" including a description of the person who kidnapped her, how the accident occurred, and how she had been injured in the accident. Based on Ms. Cox's false report an individual was arrested and brought to the Camden County sheriff's department. As the suspect was about to be booked, Ms. Cox confessed to fabricating the entire story.

A second lie is recounted in her deposition, where Ms. Cox acknowledged lying to law enforcement authorities about going to a man's motel and being raped, a story she later recanted. Wolfe's trial counsel did not try to impeach on this lie, but in view of the trial court's ruling excluding the first incident, such an attempt probably would have been futile.

In Missouri, witnesses may be impeached by showing their bad character for truth and veracity, and this character may be shown by specific acts of misconduct as to truth and veracity. *See* JOHN O'BRIEN, MISSOURI LAW OF EVIDENCE section 5–7 (3d ed.1996) (discussing cases). Specifically, a prior false report to law enforcement authorities is relevant on the issue of Ms. Cox's credibility. As the court said in *State v. Williams,* 492 S.W.2d 1 (Mo.App.1973): "If she cannot be trusted to make a truthful report to authorities, the jury may reasonably infer that she cannot be trusted on the witness stand." 492 S.W.2d at 6. Similarly, in *State v. Summers,* 506 S.W.3d 67 (Mo.App.1974), the court noted that "matters affecting the credibility of witnesses are always relevant and material particularly so when the state's case rests on the testimony of self-confessed accomplices." *Id.* at 73; *see also* 3A WIGMORE ON EVIDENCE sections 982 and 985 (Chadbourn revision 1970); *cf.* FED. R. EVID 608(b).

Both instances of prior lying are relevant, and, because they are admitted by the witness in sworn testimony, they do not call for extrinsic proof. Trial courts are given discretion in determining the scope of cross-examination, principally so

that the trial court can keep the examination inquiry focused on relevant issues and to avoid having trials within trials on past conduct that would seem to be collateral. *See State v. Isa,* 850 S.W.2d 876 (Mo. banc 1993); *State v. Kirk,* 636 S.W.2d 952 (Mo. banc 1982); *State v. Dunn,* 577 S.W.2d 649 (Mo. banc 1979). But, as the principal opinion notes, impeaching testimony should be confined to the real and ultimate object of the inquiry, which is the reputation of the witness for truth and veracity. *State v. Williams,* 337 Mo. 884, 87 S.W.2d 175 (1935).

Though trial courts are granted discretion in determining the scope of cross-examination, discretion without limits is lawlessness. As the court in *Summers* concluded, discretion cannot be used "to insulate error arising from undue restriction of the right of cross-examination as to relevant and material matters." 506 S.W.2d 67 at 73. It adds nothing to say that these prior lies are too remote–that is a matter for the jury to decide when determining what weight to give them. *State v. Williams,* 922 S.W.2d 845, 853 (Mo.App. 1996). Prior instances of false reports to the police are certainly relevant and, thus, are proper subjects for cross-examination. *See Williams,* 492 S.W.2d at 5–6. Cross-examination on matters relevant to a witness's credibility is not only a right afforded by our common law of evidence, but is guaranteed by the confrontation clause of article VI of the United States Constitution. *See Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Because Missouri's common law cases afford the cross-examination sought by Wolfe in this instance, it is not necessary to reach the confrontation issue.

The principal opinion in section III discusses impeachment by showing of prior bad acts, which differs from the kind of impeachment sought here. The principal opinion focuses on case law addressing prior bad acts of a witness, e.g., a charge of

second-degree murder in *State v. Lockhart*, 507 S.W.2d 395 (Mo.1974), rather than on case law that establishes impeachment by showing bad character for truth and veracity through evidence of specific prior acts of untruthfulness, as in the false report to authorities in *Williams*, 492 S.W.2d at 6. If Ms. Cox's prior acts had involved prostitution, or the commission of a violent act, they would not be allowed because they do not bear on the issue of character for truth and veracity. O'BRIEN, *supra*, section 5–7. Thus the authorities discussed in the principal opinion are correct, but do not apply to the current case.

The exclusion of Ms. Cox's prior lies certainly is prejudicial. Without this character background, the jury could well conclude that her false kidnapping story was simply occasioned by her fear of defendant Dannie Wolfe. With the proper impeachment, the jury might conclude that she is inclined to tell such lies even to authorities when she is in a difficult situation, such as the present instance when an explanation is needed as to what she was doing when she stayed out all night with Dannie Wolfe.

### The Trial Court's Rulings Denied Wolfe the Right to Present a Defense

The state frankly concedes that the prosecutor violated Rule 25.03(A)(2) by the six to seven month delay in disclosing Paul Hileman as a witness and in the even later disclosure of letters written by Hileman. The late disclosure of the letters did lead to Phil Dayton, a man who was in jail with Wolfe and Hileman. After its investigation, two days before trial, defense counsel moved for a continuance to pursue what it learned from Dayton—that a "Terry Smith" had been planning to rob the Walters couple and had asked Dayton to join in the effort. Dayton ultimately was unable to participate in the planned robbery, because he was confined in the Jackson County jail, but burglar Dayton also testified, in an offer of proof, that "I'm not a robber, so I wouldn't participate in the crime with Terry." Dayton also linked Terry Smith to a .25 caliber handgun. Testimony of Barbara Reeder was presented by the defense in an offer of proof; the witness, who was acquainted with Ms. Cox and Terry Smith, placed Jessica Cox in the company of Terry Smith near the same time that these murders were committed.

All references to Terry Smith apparently were excluded by the trial court's ruling, consistent with the prosecutor's argument that "the general law that the sort of evidence that appears to be suggested in this motion is nonadmissible, that is, it is not allowable for the defendant to suggest that someone else did it without some *direct* evidence of that being correct. In other words, you can't float out a red herring, proposed alternative theories in the midst of a trial without *direct* evidence that someone else committed this murder." (emphasis added).

Dayton testified, but was not questioned about Terry Smith; the record is unclear as to whether this was due to the court's previous ruling. Barbara Reeder did not testify before the jury, presumably because of the court's exclusionary ruling.

The defense's other attempt to present its theory was through its subpoena of a former roommate of Ms. Cox, whose affidavit, as noted above, avers that Ms. Cox told her that she was in the company of two men other than Dannie Wolfe who murdered the Walters couple. The former roommate did not appear pursuant to the subpoena, and the trial court denied any continuance for the purpose of locating the witness. The trial court correctly ruled that the affidavit could not be used for impeachment. While the matter of a continuance is within the trial court's discretion, *State v. Reece*, 505 S.W.2d 50, 52 (Mo.1974), the roommate matter does emphasize that the defense had a supportable theory that others had committed this crime, not Dannie Wolfe. In denying a continuance the trial court may consider the likelihood that the witness will be

found. *State v. Oliver,* 572 S.W.2d 440, 445 (Mo. banc 1978). But where the matter is so important, as in this case, it seems inherently unreasonable to deny even an overnight continuance for an opportunity to find the witness and enforce the subpoena. It was later learned at Wolfe's hearing for a new trial that the roommate's family knew her whereabouts at the time of Wolfe's trial.

The right of a defendant to avail himself of any and all defenses is well established and constitutionally protected. *State v. Carothers,* 743 S.W.2d 489, 491 (Mo.App. 1987); Mo. CONST. art. I, section 18(a). To utilize a defense theory of innocence, no matter how unlikely the theory, one must only show that " 'the most favorable construction of the evidence supports it.' " *Carothers,* 743 S.W.2d at 491 (citing *State v. Kinard,* 245 S.W.2d 890, 893 (Mo.1952)). Here, Wolfe had evidence to support a theory that someone else was responsible for the murders of the Walters. Under the trial court's rulings, Wolfe was not permitted to present this theory.[9]

Dannie Wolfe was convicted of the murders of Lena and Leonard Walters without any physical evidence linking him to these crimes. He was convicted on the testimony of Jessica Cox, after the trial court excluded relevant impeaching evidence. The jury also was precluded from hearing evidence to suggest that persons other than Wolfe committed these murders. These legal errors warrant a new trial.

Jurors were chosen from another venue, presumably to get unbiased jurors who had not heard extensive media reports of the official version of these crimes. But the rulings discussed herein show that Wolfe did not receive a fair trial.

The American jury trial is a search for truth, not a ceremony to confirm official truth. The limitations on cross-examination and the preclusion of a substantial defense theory thwarted a proper search for the truth. A new trial should be granted.

### This Court's Independent Review

In death penalty cases, section 565.035 calls on this Court to make a review of the whole record, independent of the findings and conclusions of the judge and jury, and to assess, among other matters, "the strength of the evidence." Section 565.035.3(3). *State v. Chaney,* 967 S.W.2d 47 (Mo. banc 1998).

If there was strong evidence that Wolfe committed these murders, the death penalty would be appropriate under the law and the facts of these crimes. These were brutal, bloody and thoroughly despicable murders of an elderly couple to rob them. A careful review of the record in this case leaves considerable doubt as to whether or not Dannie Wolfe committed these murders.

The state's case rests largely on the testimony of Ms. Cox. Her story has numerous flaws, is refuted as to the time of death, and is unsupported by any physical evidence linking Wolfe to these murders. That leaves the jailhouse confession story told by Paul Hileman, whose testimony proves only that he would say anything to get out of prison. The prosecution's late disclosure of Hileman and even later disclosure of his letters, conceded to be violations of our rules, can most charitably be construed as a reluctance to use this witness at all. This Court should be especially reluctant to rely on this testimony to affirm a sentence of death.

---

**9.** Wolfe's brief raises the denial of continuance both as to the Dayton testimony and as to the former roommate witness, who failed to appear to testify. The brief's "points relied on" do not specifically assert that the trial court's rulings excluding references to Terry Smith constituted a denial of the defendant's right to present a defense. However, that right is so fundamental that it should be reached by way of plain error analysis even if it cannot be fairly read into the points raised in Wolfe's brief. *See State v. Moon,* 602 S.W.2d 828, 837 (Mo.App.1980).

In *Chaney*, this Court, in a 4–3 split, affirmed a murder conviction but, upon assessing the strength of the evidence, set aside the death sentence under the proportionality review statute, section 565.035. 967 S.W.2d at 60. If the three dissenting judges—Covington, Robertson and White—were correct that there was insufficient evidence to sustain a conviction, the defendant may be wrongly imprisoned but at least he will not be wrongly executed. In *Chaney*, there was physical evidence linking the defendant to the victim at the time the murder occurred, and evidence of concealment by defendant, as well as other circumstantial evidence that the majority found sufficient to support the verdict. But, as the principal opinion notes, there was no eyewitness, unlike this case where the principal opinion affirms a sentence of death on the basis of Jessica Cox's story. If there is a difference between this case—where there is no physical evidence linking Wolfe to these murders, and *Chaney*, where there is such evidence – it is that there was stronger evidence in *Chaney* than in this case.

In *Chaney*, this Court followed the statute and reviewed the strength of the evidence to ascertain whether the death penalty should be imposed. The principal opinion now refers to that review as being asked to serve as a thirteenth or "super" juror. However, in *Chaney*, the Court acted as a super juror because the statute so requires and the Court found the evidence too weak to justify the death sentence – contrary to the jury's finding. The majority chooses to examine only the evidence and inferences favorable to the verdict in making its review in this case. That standard is appropriate to determine whether the evidence supports the conviction. The jury here believed the testimony of Ms. Cox or Hileman, or both, and that testimony is sufficient to uphold this conviction (putting aside, for now, the evidentiary rulings that would warrant a new trial).

A review of all of the evidence, not just the evidence favorable to the verdict, should be constitutionally required as a matter of due process of law.[10] The United States Supreme Court interprets the due process clause of the 14th Amendment to require such a review when punitive damages are assessed against a defendant. *See Honda Motor Co. Ltd. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994) and *BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). *Oberg*, for example, post-verdict determination that there was evidence to support the jury's verdict was held to be insufficient to satisfy due process and that "judicial review of the amount awarded" is a required procedural safeguard. 512 U.S. at 432, 114 S.Ct. 2331. Similarly, *Gore* teaches that the reviewing court must be satisfied that the punitive-damages defendant's conduct was sufficiently "reprehensible" so that the punishment imposed is not disproportionate, 517 U.S. at 575, 116 S.Ct. 1589. If that is the standard for reviewing punitive damages judgments in civil cases, can we justify a lesser standard where the defendant faces a punishment that requires not a loss of money but his life?

The question is particularly pertinent in this case. Where there is no physical evidence linking Wolfe to these killings, we must determine whether the testimony here was sufficiently believable to justify a death sentence.[11]

The purpose of the review required by section 565.035.3 is to safeguard against execution of those who may not be guilty.

This review is not just for the defendant, it is for ourselves. The honorable reputa-

---

**10.** *But see Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), which holds that the Eighth Amendment does not require a proportionality review in a state's death penalty scheme.

**11.** At least in *Chaney* there was physical evidence that defendant was with the victim in the place where the killing occurred. There is no such evidence here.

tion of our legal system is tarnished by ordering the execution of those who may not be guilty.

By examining only the evidence and inferences favorable to the verdict, the majority is willing to bet the honor of our system on the word of a witness who has trouble with the truth and a jailhouse snitch. I am unwilling to take that gamble.

Section 565.035 requires an independent review. A review of the record leaves substantial doubt as to Wolfe's guilt. To vote to affirm the sentence of death on the strength of this record is simply indefensible.

### Conclusion

Dannie Wolfe should be granted a new trial. If not, at least his death sentence should be set aside under section 565.035 because of the likelihood that otherwise he will be executed for crimes he did not commit.