

# NUMBER 13-22-00439-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN RE THE COMMITMENT OF EDUARDO DE LEON

### On appeal from the 206th District Court
### of Hidalgo County, Texas.

## MEMORANDUM OPINION

**Before Justices Longoria, Silva, and Peña**
**Memorandum Opinion by Justice Longoria**

A jury found appellant Eduardo De Leon to be a sexually violent predator (SVP). *See* TEX. HEALTH & SAFETY CODE ANN. ch. 841 (SVP Act). The trial court signed a final judgment and an order of civil commitment. *See id*. § 841.081. By two issues, appellant argues that the evidence is legally and factually insufficient to support the "behavior abnormality" element of the State's case. We affirm.

## I.    BACKGROUND

Before the State sought to have appellant committed as an SVP, appellant had previously been convicted of three felony offenses involving the sexual misconduct of three different child victims. In 1992, a jury found appellant guilty of aggravated sexual assault of a child and sentenced him to sixteen years' imprisonment. In 1996, shortly after being released on parole for his first conviction, appellant pleaded guilty to committing aggravated sexual assault of a child and indecency with a child against separate victims. Appellant was sentenced to thirty years' imprisonment as to each offense. During trial for this case, the State presented testimony from appellant and Dr. Michael Arambula.

### A.    Appellant's Testimony

Appellant testified that he was sixty-six years old and suffered from erectile dysfunction, nerve damage, neuropathy, diabetes, and Parkinson-like symptoms. When asked about his 1992 conviction for aggravated sexual assault of a child, appellant admitted that the victim, "Debra,"[1] was his ex-wife's eight-year-old niece, and that he had met her when he was about thirty years old. He stated he believed that his wife and her sister "set him up" regarding his offense as they were jealous of him. While appellant denied being sexually attracted to Debra, he also stated that she was "a little more mature for her age body-wise," "a big boned lady for her age," and "more mature than other eight[-]year[-]olds." According to appellant, Debra would flirt with him when she came to his house by trying to hug him from the waist down, "right here on the stomach." Appellant stated that he thought that Debra teased him, "but she didn't understand what she was

---

[1] We refer to the child victims by pseudonyms to protect their identities.

2

doing." He stated that Debra wore tight shorts, and believed that she knew what he was doing when he was touching her—"She just kind of look[ed] at me . . . just what are you doing . . . but she never said stop or anything like that." Appellant stated that he thought Debra wanted him to touch her because "she kind of flirted a little, like a come-on." Appellant admitted to touching Debra's breasts "[p]layfully, [a ]couple of times," and touching her behind "[a] couple [of] times," and rubbing his penis on her vagina. However, appellant stated that he tried to penetrate her, but never did because he "didn't put it in". He admitted to threatening Debra not to tell anyone what happened. He also admitted to knowing it was wrong to sexually touch Debra but did it anyway.

When asked about his subsequent 1996 conviction for aggravated sexual assault of a child, appellant admitted that this offense occurred when he was about forty years old and involved six-year-old "Anna." He stated he knew Anna for less than a year, that she had lived with her family in a downstairs apartment, and he lived above them. He admitted that he had sexually assaulted Anna during a visit to her family after they had moved to a different city. Appellant stated that he was aroused from Anna "playing with [his] object," and that she did so "voluntarily." According to appellant, he was inside his truck when "she just came by and . . . touched [his] private parts." Appellant denied asking her to do so and stated he "didn't ask for nothing." Appellant said that he was not attracted to Anna but admitted to asking her to perform oral sex on him, and believed she wanted to do so because "[s]he . . . just went for it." Appellant said, "I don't know how to explain that. I'm just telling you she went straight to it."

Appellant maintained that he felt that Anna knew what she was doing, and that he

3

did not force her to do anything. When asked if he had Anna's brother touch Anna's vagina while appellant watched, appellant waivered before admitting, "[Y]eah, I think I seen that one time." Appellant denied asking Anna's brother to do so and denied touching Anna's vagina. When asked what made him want to have sexual contact with Anna that day, appellant replied, "She—like I said, she was a very large child. She—I don't know where she got that knowledge, how to do and she just—she just liked it." Appellant also stated

> [Anna] kind of—whenever she ate a lollipop or an ice cream, she did it kind of sexually, kind of—that's what I saw. She didn't eat a lollipop like a little candy. She would lick it and, you know, she give you an eye, things like that. She heightened.

Appellant admitted that he thought that Anna was flirting with him, that he knew having her perform oral sex was wrong, but he still had her do it anyway. However, appellant denied that he had Anna perform oral sex at least five other times and denied kissing her on the mouth.

Appellant also stated that he had been convicted in 1996 for indecency with a child by contact for offending against "Julia," who was about seven or eight years old and a relative of Anna. Appellant admitted that he offended against Julia during the same incident in which he offended against Anna. Appellant admitted that Julia touched his penis but stated that he did not tell her to touch him and that she did so voluntarily as "[s]he just went for it."

Appellant testified that he completed a nine-month sex offender treatment program (SOTP) in March 2022, about three to four months prior to his testimony. Appellant stated he learned about grooming, which he stated was "[a] way to set up a victim the way you show them kindness. You show them that you care. You pay attention to them." When

4

asked if he groomed his victims, appellant replied "Not really." Though he agreed to the importance of admitting to his offenses, appellant stated he is not sexually attracted to young boys or girls and believes he is not a sex offender "[b]ecause everything just happened for a reason right there." Appellant maintained, "I never went looking for the victims or anything." Appellant stated he does not believe he has any risk to commit sex offenses in the future, and that he will avoid doing so by "[t]hink[ing] better. When you think—when you change your thinking, you change your behavior. Stay away from victims. Stay away from where high-risk situations are. There's no need to go in there."

During cross-examination, appellant stated that he did not want to go back to prison and believes he had been rehabilitated. He stated that he had a normal childhood until he was sexually abused by his cousin, and that the alleged abuse had changed his whole life and affected his actions and criminal behavior. Appellant testified that he thinks differently now "by thinking, if I come to a situation, I will think about it and try to—if I can avoid it, I'll avoid it." According to appellant, he did not think about what he was doing in 1996, that he would do things and then think about the consequences later. When asked what steps he would take to avoid children if released from custody, appellant stated

> I will avoid it at all cost being around children. It will cost my freedom. Like I said, I don't want to come back to prison. I don't want to be in prison no more. I had enough. It . . . [is ]not right being around children for me. It's not that I'm going to commit a sex offense or anything, or harm them, but the best thing for me to do is just stay away from them. That's the best thing I can do, avoid it.

Appellant stated he was sorry for offending against the three child victims and apologized for his actions. He stated, among other things, that he planned to work with his younger brother's poultry farm and his brother-in-law's carpentry business if released. Appellant

5

also stated he eventually wanted to re-open his tree-trimming business.

**B.** **Dr. Arambula's Testimony**

Dr. Arambula, a psychiatrist, testified that appellant suffered from a behavior abnormality within the meaning of the SVP act. Dr. Arambula followed standard methodologies and explained in detail the bases of his opinion, which included an interview he had with appellant in August 2021; investigative and court records of appellant's offenses; administrative records of appellant's incarceration—including his completion of a nine-month SOTP in March 2022; and appellant's deposition testimony in April 2022.

Dr. Arambula testified that appellant's history revealed the presence of risk factors indicating that appellant had an increased risk for recidivism. Dr. Arambula explained that sexual deviance, one risk factor, is "an abnormal pathologic sexual condition." Dr. Arambula diagnosed appellant with pedophilia, which Dr. Arambula explained was a subset of sexual deviance and defined as "[a] pathological sexual interest, activities, fantasies that involve children who are not able to give consent." Dr. Arambula also explained that appellant's pedophilia was a non-exclusive type, meaning he also has had sexual activity with adults. Regarding the significance of this diagnosis, Dr. Arambula explained that appellant's sexual deviance was a chronic and dangerous condition as evidenced by his history.

Dr. Arambula explained that appellant's 1992 conviction for aggravated sexual assault was based on Debra's report that she and appellant had engaged in intercourse and oral sex. Dr. Arambula stated that, according to Debra's statement, appellant had

sexually abused her several times over the course of a year. When Dr. Arambula and appellant discussed this incident during their interview, appellant "denied any penetration at all" and stated there was "some touching on top of her pants and under her pants . . . and then he also acknowledged that he rubbed his penis on her butt one time." Dr. Arambula viewed appellant's statements as a "manifestation of . . . denial and not accepting responsibility for what he was convicted of."

Dr. Arambula also explained that records indicated that appellant's subsequent conviction for aggravated sexual assault of a child in 1996 involved five-year-old Anna and five incidents of oral sex. When discussing with appellant this offense, Dr. Arambula opined that appellant believed himself to be the victim in each instance of sexual abuse: "In other words, she came on to him. She . . . gave him oral sex, and he didn't resist, but he let it happen and that was his mistake for letting it happen." Dr. Arambula also opined that appellant's display of "victim[ ]stance" was clinically significant because it was part of his sexual deviance and "twisted thinking."

In addition, Dr. Arambula testified that appellant's 1996 conviction for indecency with a child involved seven-year-old Julia, and appellant had her touch his penis with her hand. When discussing this offense, Dr. Arambula testified that appellant stated that "she did it on her own." Dr. Arambula stated that he did not find appellant's statement as an admission of the offense.

Dr. Arambula testified that "[p]er the research, when there [is] more than one sexual offense conviction[], the risk of recidivism is almost doubled when compared to the other individuals who have only committed one sexual offense." According to Dr.

7

Arambula, the more incidents of sexual misconduct or offenses involved, the more serious the illness—"That means it's ongoing, and also in turn there's a high risk for recidivism where there are more incidents as opposed to just one incident." Dr. Arambula explained that offending after going to prison further aggravates the risk to reoffend. Dr. Arambula testified that appellant's subsequent offenses committed after being placed on parole for his 1992 conviction was significant because "[i]t infers that having been punished for his first sexual offense, that his illness was so significant that . . . the lessons . . . he should have learned were overtaken by his sexual deviance." Dr. Arambula further explained that research does not suggest that the risk of recidivism goes down with all sex offender types with age. Rather, the research suggesting that the likelihood of recidivism decreasing over time as the offenders age excludes pedophile sex offenders.

Dr. Arambula also discussed the presence of protective factors, or factors which do not aggravate or elevate the risk of recidivism. Dr. Arambula highlighted that appellant's protective factors were his support system; his lack of significant antisocial personality pathology; his lack of drug or alcohol abuse; his completion of technical or trade courses and his GED while in prison; his positive work history while in prison; and his lack of disciplinary actions while in prison. Nevertheless, according to Dr. Arambula, the presence of protective factors did not mean that appellant did not have a behavior abnormality.

Dr. Arambula also acknowledged that appellant had completed an SOTP after their interview and received "great marks on the concepts and subject matter." Dr. Arambula noted that though records of the SOTP indicated appellant made good progress, "there

8

was a comment that he still needed ongoing treatment and especially aftercare." Despite appellant's completion of the SOTP, Dr. Arambula testified that there was still evidence that appellant suffers from pedophilia today—namely, statements that appellant had made during his deposition, which occurred one month after completing the SOTP. Dr. Arambula described appellant's deposition testimony as exemplifying his continued denial of his offenses because appellant attributed blame to the child victims for what happened to them. Dr. Arambula testified that he did not believe that appellant understands why he offended against children based on reviewing his deposition. Dr. Arambula concluded that appellant's risk to reoffend is very high based on his history, number of victims, and the number of incidents, "all of which demonstrate [how ]chronic and how repetitive his illness has been with regards to sexually acting out with minors." Regarding whether appellant's emotional or volitional capacity was affected, Dr. Arambula stated

> When I talked to him, he seemed like he was starting to put things together. The records indicated that he was progressing. And then I saw him regress or slip way back now—when I read the deposition. So that's—what I read in the deposition affirms that he's still seriously ill and carries a high risk for recidivism.

When asked about whether appellant understood how his own experience as a victim of sexual abuse affected him, Dr. Arambula replied that that matter was discussed and that appellant was angry that he had gotten convicted of sex crimes when his abuser did not. Dr. Arambula stated that a previous psychologist had evaluated appellant using the Static 99R test, the results of which indicated that appellant's risk to reoffend was below average. However, Dr. Arambula revealed that this psychologist still concluded that

9

appellant had a behavior abnormality. Dr. Arambula also explained that the fact that appellant had diabetes or erectile dysfunction did not affect his opinion that appellant has a behavior abnormality:

> So sex drive, or the fancy term is called libido, that exists in the brain. It's not affected by diabetes or other medical conditions unless that person has a stroke in that particular area of the brain, and that's not the case here.
>
> Erectile dysfunction is something that happens to men as they get older, can happen to people that have diabetes, as well. There are ways to overcome it, like taking Viagra or Cialis, those kind of agents, but that's not offered in prison. So that's . . . the basis for my opinion that . . . diabetes and the treatment for it don't affect my opinion.

After the parties presented closing arguments, the jury found appellant to be an SVP. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Appellant challenges the legal and factual sufficiency of the evidence supporting the jury's finding that he is an SVP.

### A. Applicable Law & Standard of Review

The SVP Act provides a procedure for the involuntary civil commitment of an SVP. *See id.* §§ 841.001–.153. The SVP Act was enacted based on legislative findings that "a small but extremely dangerous group of [SVPs] exists" and that "those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence." *Id.* § 841.001.

Under the SVP Act, a person may be civilly committed if the factfinder determines by a unanimous verdict and beyond a reasonable doubt that the person is an SVP. *See*

10

*id.* §§ 841.062, 841.081. An SVP is defined as a person that (1) is a "repeat sexually violent offender," and (2) "suffers from a behavioral abnormality that makes [him] likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a). A person is a "repeat sexually violent offender" if the person is convicted of more than one "sexually violent offense" and a sentence is imposed on at least one of those convictions. *Id.* § 841.003(b). The SVP Act defines "sexually violent offense" to include certain sexual offenses enumerated in the Texas Penal Code, including sexual assault, as well as offenses with substantially similar elements under prior state law or the law of other jurisdictions. *See id.* § 841.002(8), (A) (listing sexual assault as a sexually violent offense); TEX. PENAL CODE ANN. § 22.011. A behavioral abnormality is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." TEX. HEALTH & SAFETY CODE ANN. § 841.002(2). Whether a person suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence is a single, unified issue. *In re Commitment of Bohannan*, 388 S.W.3d 296, 303 (Tex. 2012).

"A commitment proceeding under the SVP Act is the unusual civil case incorporating the 'beyond a reasonable doubt' burden of proof [standard] typically reserved for criminal cases." *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020) (citing *In re Commitment of Fisher*, 164 S.W.3d 637, 641 (Tex. 2005)). The Texas Supreme Court observed in *Stoddard* that "[t]he legal-sufficiency standard in criminal cases is consistent with the civil standard." *Id.* at 675 (citing *Jackson v. Virginia*, 443 U.S.

11

307 (1979)). Thus, when conducting a legal sufficiency review in a case governed by the SVP Act, we review the evidence in the light most favorable to the verdict to determine whether any rational factfinder could find the elements required for commitment under the SVP Act, beyond a reasonable doubt. *Id.* Under this standard, "it is the fact[]finder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts." *In re Commitment of Cordova*, 618 S.W.3d 904, 915 (Tex. App.—El Paso 2021, no pet.) (citing *In re Commitment of Williams*, 539 S.W.3d 429, 437 (Tex. App.—Houston [14th Dist.] 2017, no pet.)).

In cases under the SVP Act, the evidentiary standard of review for factual sufficiency differs from the evaluation for legal sufficiency. As in a legal sufficiency analysis, the assumption remains that the finder of fact resolved disputed evidence in favor of its finding if a reasonable finder of fact could do so. *Stoddard*, 619 S.W.3d at 674. However, in a factual sufficiency analysis, disputed evidence that a reasonable finder of fact could not have credited in favor of the finding is treated differently. *Id.* at 676. Therefore, in a factual sufficiency review, we must determine whether, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the verdict, along with undisputed facts that do not support and are contrary to the verdict, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were satisfied. *Id.* at 678. A reviewing court's mere disagreement with the factfinder's verdict "as to proper evidentiary weight and credibility cannot be the basis of a reversal on factual-sufficiency grounds." *Id.* at 677.

**B.     Discussion**

**1.     Legal Sufficiency**

In his first issue, appellant raises a legal sufficiency claim. It is undisputed that appellant is a repeat sexually violent offender as the SVP Act defines that term. Appellant complains only that the evidence was legally insufficient to support the beyond-a-reasonable-doubt finding that he suffers from the requisite behavior abnormality.

As a threshold issue, we address appellant's arguments regarding how the SVP Act's definition of behavioral abnormality should be construed in connection with his sufficiency claim. According to appellant, "case law sheds little light on what [the SVP Act's] 'behavioral abnormality' definition means and what the State actually does have to prove to establish this element of its case."

Appellant argues that the SVP Act's behavior abnormality definition is ambiguous and urges this Court to apply traditional statutory-construction rules and interpret the definition in a manner consistent with its legislative history. According to appellant, that legislative history is consistent with the SVP Act's legislative findings and indicates the statute was "intended (and should be construed) to apply to healthy and still youthful sex offenders who are about to be released from prison after having served 'lenient' prison sentences." Appellant further argues that the SVP Act "was not meant to apply to old men (like [appellant]) in ill health who are not psychopaths and who are about to be released from prison after having served lengthy prison terms no matter how dangerous the State and its experts think these old men are."

We review issues of statutory interpretation de novo. *See Loaisiga v. Cerda*, 379

S.W.3d 248, 254–55 (Tex. 2012). "When construing a statute, our primary objective is to give effect to the Legislature's intent," and "[w]e seek that intent first and foremost in the statutory text." *Colorado County v. Staff*, 510 S.W.3d 435, 444 (Tex. 2017) (quoting *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015) (cleaned up)). We look at the statute's plain and ordinary meaning, "and then consider the term's usage in other statutes, court decisions, and similar authorities." *EBS Sols., Inc. v. Hegar*, 601 S.W.3d 744, 749 (Tex. 2020) (quoting *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017)). "We turn to extrinsic sources only if the statute is ambiguous or if applying the statute's plain meaning would produce an absurd result." *Id.* The statutory text is determinative when it is clear, and "we may not look beyond its language for assistance in determining legislative intent unless the statutory text is susceptible to more than one reasonable interpretation." *Staff*, 510 S.W.3d at 444.

The statute defines a "behavioral abnormality" as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." TEX. HEALTH & SAFETY CODE ANN. § 841.002(2). This term is used in conjunction within Chapter 841's definition of "sexually violent predator," which defines the elements the State needs to prove, namely that a person (1) is a "repeat sexually violent offender," and (2) "suffers from a behavioral abnormality that makes [him] likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a).

14

We note that appellant simply concludes that the "behavioral abnormality" definition is ambiguous without explaining the basis of that assertion. In addition, appellant does not argue that applying the plain meaning of the SVP Act's definition of "behavior abnormality" leads to absurd results. *See EBS Sols., Inc.*, 601 S.W.3d at 749. We do not find the plain meaning of "behavioral abnormality" to be ambiguous. *See id.* In addition, the supreme court has already interpreted the term:

> Boiling it down, a behavioral abnormality is "a . . . condition that . . . predisposes" sexually violent conduct. The modifier, "predisposes[,"] qualifies and describes "condition[."] The required condition *is* the predisposition. The condition has no other qualities, other than that it can be congenital or acquired. The condition and predisposition are one and the same. The definition might more clearly be written:
>
> > "Behavioral abnormality" means a congenital or acquired predisposition, due to one's emotional or volitional capacity, to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person.

*Bohannan*, 388 S.W.3d at 302–03; *see also Fisher*, 164 S.W.3d at 656 (rejecting a claim that the SVP Act's behavioral abnormality definition was unconstitutionally vague). Nothing in Chapter 841 provides the term "behavior abnormality" with a different legislative definition, nor do we find one apparent from the context of the statute as a whole. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.153.

We also do not find that applying the plain meaning of the SVP Act's definition of "behavior abnormality" leads to absurd results in the manner that appellant seems to suggest because nothing in the statute excludes the class of sex offenders of which appellant claims to be a part. *See EBS Sols., Inc.*, 601 S.W.3d at 749. In other words, the SVP Act does not expressly exclude any class of sex offenders by advanced age, ill

15

health, a lack of psychopathy, or length of prison sentences, nor do we find such an interpretation a reasonable one. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.153; *see also PHI, Inc. v. Tex. Juv. Just. Dep't*, 593 S.W.3d 296, 305 (Tex. 2019) ("[N]o court has the authority, under the guise of interpreting a statute, to engraft extra-statutory requirements not found in a statute's text."); *Staff*, 510 S.W.3d at 444 ("When interpreting the Legislature's words . . . we must never rewrite the statute under the guise of interpreting it, and we may not look beyond its language for assistance in determining legislative intent unless the statutory text is susceptible to more than one reasonable interpretation.") (internal quotations omitted).

Furthermore, the supreme court in *Stoddard* rejected a similar claim. In *Stoddard*, the supreme court unambiguously held that the "small but extremely dangerous group" language contained in the SVP Act's legislative findings is not part of the statute's definition of "sexually violent predator" (and thus not part of the statute's definition of "behavioral abnormality") and is not an element a factfinder is required to find. *See Stoddard*, 619 S.W.3d at 677 (concluding appeals court erred in finding evidence insufficient where it found, among other things, that the appellant was not part of small but extremely dangerous group referenced in legislative findings). Thus, the supreme court clarified that the SVP Act's two statutory elements—repeat sexually violent predator and behavioral abnormality—are the only factors courts should consider in a sufficiency review. *See id.* at 676–78.

In light of *Bohannan* and *Stoddard*, and having found no ambiguity, we decline appellant's invitation to examine the statute's legislative history to construe the term

16

"behavioral abnormality." *See Staff*, 510 S.W.3d at 444. Having rejected appellant's argument, we next determine whether the evidence was legally sufficient to support the jury's finding that appellant has a behavioral abnormality as expressly defined in the SVP Act.

Here, Dr. Arambula specifically defined "behavior abnormality" as provided in the SVP Act and explained how the statutory definition applied to appellant. Dr. Arambula testified regarding all the resources he consulted in forming his opinion, including court records, investigative records, administrative records of appellant's incarceration, his interview with appellant, appellant's deposition testimony, and the many factors he assessed in making his determination. Dr. Arambula discussed the various risk factors he considered and how those factors affected his overall conclusion regarding appellant's likelihood to commit another predatory act of sexual violence. Specifically, Dr. Arambula diagnosed appellant with pedophilia and concluded that appellant's risk to reoffend is very high based on his history, number of victims, and the number of incidents, "all of which demonstrate [how ]chronic and how repetitive his illness has been with regards to sexually acting out with minors." In addition, Dr. Arambula opined that, despite appellant's completion of the SOTP, appellant was still seriously ill and carries a high risk for recidivism as evidenced by his deposition testimony where he denied committing his past offenses and attributed blame to the child victims for what happened to them.[2] Dr. Arambula opined that appellant's display of "victim[ ]stance" was clinically significant

_____

[2] Though appellant admitted to committing his past sex offenses in his trial testimony, much of his testimony about what happened regarding each offense could be viewed as a denial of his own culpability and an engagement in victim-blaming.

17

because it was part of his sexual deviance and "twisted thinking." Finally, Dr. Arambula opined that appellant suffers from a behavior abnormality that predisposes him to engage in a predatory act of sexual violence.

There was no testimony to refute Dr. Arambula's opinion. Although appellant testified at trial, he did not offer an opinion as to whether he possessed a behavior abnormality.[3] Assessing the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could find the elements required for commitment under the SVP Act, beyond a reasonable doubt. *See Stoddard*, 619 S.W.3d at 675. Accordingly, we hold the evidence is legally sufficient to support the jury's finding and the judgment granting commitment. *See id.* at 678. Appellant's first issue is overruled.

## 2. Factual Sufficiency

In his second issue, appellant raises a factual sufficiency claim. Like his first issue, appellant does not challenge the first prong of the SVP Act that he is a repeat sexually violent offender. Rather, appellant argues

> [t]he undisputed evidence of [appellant's] advancing age and his ill health and him not being a psychopath . . . are so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met (no matter how Chapter 841's 'behavioral abnormality' definition is construed . . . ).

We again note that the SVP Act does not expressly exclude any class of sex offenders by advanced age. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.153; *see also PHI, Inc.*, 593 S.W.3d at 305. At the time of trial, appellant was sixty-six years old.

---

[3] To the extent that appellant's testimony can be construed as a lay opinion that he possessed no behavioral abnormality, the jury was free to believe all, part, or none of appellant's testimony. *See In re Commitment of Mullens*, 92 S.W.3d 881, 887 (Tex. App.—Beaumont 2002, pet. denied).

18

Appellant's age does not negate his behavioral abnormality. *See In re Commitment of Tryon*, 654 S.W.3d 29, 41 (Tex. App.—Eastland 2022, pet denied.) (holding advanced age, standing alone, is not sufficient to reverse the jury's verdict). Although appellant's age may weigh against the risk that he might reoffend, no expert witness testified on his behalf; thus, there is no testimony in the record from an expert that contradicted Dr. Arambula's opinion that appellant has a behavior abnormality that predisposes him to engage in a predatory act of sexual violence. Furthermore, Dr. Arambula did not identify age as a protective factor of appellant, diagnosed appellant with pedophilia, and explained that the likelihood of recidivism decreases over time as certain types of sex offenders age, excluding pedophile sex offenders such as appellant.

The SVP Act also does not mention ill health. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.153; *see also PHI, Inc.*, 593 S.W.3d at 305. At trial, appellant testified that he suffered from erectile dysfunction, nerve damage, neuropathy, diabetes, and Parkinson-like symptoms. However, no expert witness testified on appellant's behalf that his medical conditions negated Dr. Arambula's finding that appellant has a behavioral abnormality. Dr. Arambula also did not identify any of appellant's medical conditions as a protective factor. In addition, Dr. Arambula testified that the fact that appellant had diabetes or erectile dysfunction did not affect his opinion that appellant has a behavior abnormality because both ailments could be overcome through treatment. Dr. Arambula also explained that "sex drive, or . . . [']libido['], . . .exists in the brain" and is "not affected by diabetes or other medical conditions unless that person has a stroke in that particular area of the brain, and that's not the case here."

19

As to his final argument, a finding of psychopathy is not required for civil commitment. The statute requires the initial evaluator to test for psychopathy. TEX. HEALTH & SAFETY CODE ANN. § 841.023(a). However, there are no guidelines for subsequent evaluators like Dr. Arambula and no requirements of any particular testing results. *See In re Commitment of Hebert*, 578 S.W.3d 154, 159 (Tex. App.—Tyler 2019, no pet.) (holding psychopathy is not a requisite finding in a sexually violent predator civil commitment case). There is no authority to support appellant's position that because he is not a psychopath, he cannot be civilly committed as a sexually violent predator. We also note that though Dr. Arambula identified appellant's lack of psychopathy as a protective factor, he nevertheless testified that the presence of protective factors did not mean that appellant did not have a behavior abnormality. Furthermore, no expert witness testified on appellant's behalf indicating that his lack of psychopathy negated Dr. Arambula's finding that appellant had a behavioral abnormality.

It is solely the role of the jury to determine the weight and credibility to assign the evidence. *Stoddard*, 619 S.W.3d at 677. Although the jury may have considered appellant's age, ill health, and lack of psychopathy, the jury was entitled to accept Dr. Arambula's testimony as reasonable and credit his testimony that appellant has a behavior abnormality that makes him likely to reoffend. We do not substitute our judgment for the jury's. *See id.* After reviewing the entire record, we cannot conclude that there is any contrary evidence so significant that the factfinder could not have determined beyond a reasonable doubt that appellant had a behavior abnormality. *See id.* at 668. Accordingly, we hold the evidence is factually sufficient to support the jury's finding and

the judgment granting commitment. *See id.* at 678. Appellant's second issue is overruled.

### III.   CONCLUSION

The trial court's judgment is affirmed.

NORA L. LONGORIA
Justice

Delivered and filed on the
29th day of February, 2024.

21